IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION TWO

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 52358-2-II |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATHAN A. CHAVEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Nathan Chavez was convicted following a jury trial of four counts of third degree rape of a child, one count of third degree child molestation, and one count of witness tampering. He challenges the convictions, the exceptional aggravated sentence imposed by the trial court, and a community custody condition restricting his contact with minors that will affect postrelease contact with his children.

It is questionable whether evidence of an act of prior sexual misconduct by Mr. Chavez was admissible under ER 404(b) as evidence of a common scheme or plan, but any error was harmless. We affirm the convictions.

With respect to Mr. Chavez's challenge to the exceptional sentence, we agree with Mr. Chavez that there was insufficient evidence that he used a position of trust to facilitate the commission of some of the rapes. But the trial court also announced a "free crimes" rationale for imposing an exceptional sentence, and the same exceptional

sentence could properly have been imposed for free crimes reasons alone. Since the court's intention was not clear, we remand for resentencing.

Because resentencing is required, Mr. Chavez can use the occasion of his resentencing to raise his objection to the community custody condition.

FACTS AND PROCEDURAL BACKGROUND

In February 2017, the State charged Nathan Chavez with seven counts of child rape and one count of third degree child molestation. Following amendments, he was charged by the time of trial with four sex offenses committed against one victim, Heather W., and two sex offenses committed against a second victim, Mattie C. We substitute pseudonymous first names and an initial for the girls' surnames, consistent with a general order of this court.[1] The charges involving Heather included a special allegation that Mr. Chavez used his position of trust to facilitate the commission of the offenses. A seventh charge was for tampering with a witness: Heather's and Mattie's friend, David Buckley.

---

[1] See General Order of Division II, *In re the Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App. Aug. 23, 2011) http://www.courts .wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2011-1&div=II.

ALLEGED OFFENSES AND ASSOCIATED COUNTS

The State's trial evidence supported the following history of the offenses that, in argument, the State associated with the indicated counts:

> *Count I: A rape of Heather W. between December 31, 2014 and*
> *January 1, 2015, referred to by the prosecutor as*
> *"the New Year's count"*[2]

Heather began attending Cornerstone Baptist Church in late November or December 2014. She has a November birthday and was born in 2000, so she had just turned 14 years old. She was in the eighth grade. Mr. Chavez attended the same church. Occasionally Mr. Chavez spoke to Heather about the services and how she was doing. Mr. Chavez was then 28 years old.

Heather got Mr. Chavez's telephone number from a mutual friend and texted him about the possibility of babysitting his children. Although the children's birthdates do not appear in the record, Mr. Chavez and his wife had two toddlers and possibly an infant at the time. Mr. Chavez said he would like to get to know Heather before she could babysit. They continued texting and their messages became flirtatious. Mr. Chavez told Heather she was pretty, or beautiful, which made her feel good.

After Heather had known Mr. Chavez for about a month, he proposed that she leave church sometime so they could go somewhere and talk. They acted on the plan on

---

[2] Report of Proceedings (RP) at 713-14.

3

the night of the church's 2014/2015 New Year's Eve party. Heather left the party at around 10:00 or 11:00 p.m. and met Mr. Chavez down the road. He drove to a dead end road, where they initially talked, until Mr. Chavez unbuckled his seat belt, moved toward Heather, put his arms around her and started kissing her. Heather did not try to stop him. Mr. Chavez undressed Heather and eventually moved on top of her in the passenger seat and had sexual intercourse.

They dressed and Mr. Chavez drove Heather back to the church party. Heather told only one friend about what happened because she did not want anyone to know about it and did not want Mr. Chavez to get in trouble.

> *Count II: A rape of Heather W. between December 31, 2014 and May 31, 2015, referred to by the prosecutor as the "[Heather's] house charge"*[3]

On the second occasion on which Mr. Chavez raped Heather, he came to her home when her mother was absent and tapped on her window. She had just gotten out of the shower and was surprised to find him outside her window. He said he missed her and needed to see her and she let him in, happy to see him but nervous because she did not know when her mother would be home. Mr. Chavez kissed Heather, undressed himself, took off Heather's towel, and again had sexual intercourse with her. He then dressed and left through the window.

---

[3] RP at 714.

*Count III: A rape of Heather W. between December 31, 2014 and May
31, 2015, referred to by the prosecutor as "the incident at his house"*[4]

Heather testified that on a third occasion, Mr. Chavez suggested that they meet up

and said he would pick her up at her house. Heather told her mother she was going for a

run and met Mr. Chavez down the street.

Mr. Chavez took Heather to the guest apartment that his wife rented from Betty

Goad, where he and his family lived. According to Heather, Mr. Chavez took her to his

and his wife's bedroom and undressed her and himself. They had sexual intercourse.

Heather felt nervous at the Chavez home and would later testify, "[T]hat's when

like it kinda changed"—seeing things that belonged to Mr. Chavez's wife and children

made her realize she "was just this young girl engaging with this older man that was

married and had kids." Report of Proceedings (RP) at 124. She questioned why she "was

letting it happen." *Id.* After they dressed, Mr. Chavez took Heather back to the corner

where he picked her up. Once again, she only confided in the friend in whom she had

confided before, because she knew what she was doing was wrong, was embarrassed, and

did not want anyone to know about it.

After the sexual relationship ended, Mr. Chavez stopped talking to Heather for a

while, but he showed up at the coffee shop where she worked a few times, sometimes

---

[4] RP at 727.

with his children. He usually gave her a large tip—from $10 to $80. Heather quit

attending the Cornerstone church after a few months.

*Count IV: The child molestation of Heather,
between January 1, 2016 and August 31, 2016*

In or about May of the next year, after Heather's sexual relationship with Mr.

Chavez was over and when Heather was 15 and in ninth grade, she attended a carnival

with friends. After the carnival, her friend David Buckley, his good friend Jesse, who

was Mr. Chavez's younger brother (Jesse would have been about 17),[5] and a third male

friend, stopped at Heather's house to pick up Heather and her female cousin to "hang out

and drink." RP at 130. They went to a house that belonged to a third Chavez brother,

Isaac, and drank beer and vodka. Mr. Chavez was also there and was drinking. Heather

had a lot to drink and could not remember parts of the night, including how she got home.

Jesse drove everyone home between midnight and two in the morning. Four

passengers rode in the bed of his truck, under a canopy: Mr. Buckley, Heather, her

cousin, and Mr. Chavez. Heather's cousin and Mr. Buckley both testified that Mr.

Chavez pulled Heather's pants down and had his hands on her. Heather's cousin

believed Mr. Chavez was touching Heather's vagina; Mr. Buckley described Mr. Chavez

---

[5] Jesse testified at trial that he was born in May 1999, and is the youngest of his siblings; Mr. Chavez is the oldest. Our references to "Mr. Chavez" in this opinion are to the defendant; for clarity, we refer to his younger brothers by their first names. We intend no disrespect.

as "[m]assaging her butt." RP at 331. According to Mr. Buckley, Mr. Chavez climbed

on top of Heather, unzipped his pants and said, with a laugh, "whiskey dick," which Mr.

Buckley took to mean Mr. Chavez "couldn't get hard." RP at 333. According to

Heather's cousin, she, Mr. Buckley, and Heather told Mr. Chavez to stop. Mr. Buckley

agreed that Heather was trying to stop Mr. Chavez "to her extent," but she "was very

intoxicated." RP at 332. When Mr. Chavez did not stop, Mr. Buckley banged on the

window of the truck's cab and yelled at Jesse to pull over and get his brother out of the

truck. Jesse pulled over, Mr. Chavez got out of the truck, and Jesse took his remaining

passengers home.

> *Count V: A rape of Mattie C. between September 28, 2016 and October 31, 2016, referred to by the prosecutor as the "incident at Slab Camp"*[6]

In the fall of 2016, Mattie attended a pep dance in the school cafeteria after an

early season high school football game and went to a party thereafter. With a November

2001 birthdate, she was 14 years old at the time, and in the ninth grade.

Jesse Chavez drove her, Mr. Buckley, and three other male friends to the after

party. The party took place at Slab Camp, which was described as "a place up in the

woods, in Sequim, where . . . people go to drink and have fires." RP at 212. Before they

---

[6] RP at 720.

went to Slab Camp, they stopped at a Walmart store and met up with Mr. Chavez. Mr. Chavez, then 29 years old, was in a truck with two of Mattie's female schoolmates.

While at Slab Camp, Mattie drank alcohol that she got out of the bed of Mr. Chavez's truck. Others, including Mr. Chavez, were drinking, smoking marijuana, and having a fire. After about an hour, the party ended and almost everyone got in Jesse's truck, but Mattie understood that there was no room for her, so she relied on Mr. Chavez for a ride home. She was Mr. Chavez's only passenger. As they drove, Mr. Chavez complimented Mattie on her appearance and put his hand on her leg. According to her, Mr. Chavez knew she was 14. He told her he was 20.

Mr. Chavez followed Jesse's truck for a while, but lost sight of him. Mr. Chavez pulled over in a field with no streetlights and said he was going to text and see where Jesse was. While they were stopped, Mattie claims that Mr. Chavez "scooped [her] out of the seat onto his lap." RP at 219. According to Mattie, Mr. Chavez kissed her, undressed her, and put her back in the passenger seat. He then climbed over the center console and had sexual intercourse with her. She said it made her feel "[g]ood, I guess" having sex with Mr. Chavez; "It was just the appeal of like an older guy." RP at 220.

Mattie claims that they put their clothes back on and drove to a church parking lot where they met Jesse. Mattie later told a friend that Mr. Chavez "tried to have sex with" her but did not tell her what really happened, knowing that her friend would tell people. RP at 221.

8

*Count VI: A rape of Mattie C. between September 28, 2016 and*
*November 25, 2016, referred to by the prosecutor as the*
*"friend's house event"*[7]

About a week after the Slab Camp after-party, Mr. Chavez texted Mattie and asked if she wanted to go to a party with him. She agreed, and Jesse gave her a ride to a party at the home of a friend of the Chavez brothers.

At the party, Mattie and Mr. Chavez drank alcohol and talked. After about an hour, she left with Mr. Chavez and they drove to Port Williams. They parked near a boat ramp, talked, listened to music, and Mattie drank vodka. While there, a sheriff's deputy arrived and Mr. Chavez told Mattie to put the bottle of vodka under her seat. The deputy and Mr. Chavez spoke for a few minutes; Mattie remembered the deputy had an accent. After that, Mr. Chavez took Mattie "four-by-fouring," which she described as "[r]ock climbing with your truck." RP at 229. After, Mr. Chavez parked in the woods, turned off the lights, and had sexual intercourse with her. They then put their clothes back on and Mr. Chavez took Mattie home.

*Count VII: Tampering with witness David Buckley on or about September 26, 2017*

On September 26, 2017, after police had interviewed Mr. Buckley about what he saw Mr. Chavez do during the incident charged as child molestation in count IV, Jesse presented Mr. Buckley with a gift of a new iPhone. Jesse had previously given Mr.

---

[7] RP at 723.

9

Buckley "small things here and there," but Mr. Buckley described the iPhone gift as much more expensive and "kinda weird." RP at 344, 354.

After Jesse presented the gift to Mr. Buckley, the two went to Jesse's house where Mr. Buckley could use the home's WiFi to set up the phone. Mr. Chavez was there. According to Mr. Buckley, Mr. Chavez eventually came over to him and asked if he was still friends with Heather and her cousin. Mr. Buckley replied, "[N]ot really, sort of." RP at 350. Mr. Buckley later testified that Mr. Chavez "asked if [I] could talk to them and get them to maybe quit lying, as he would put it." *Id.* Mr. Chavez also said something like, "[Y]ou can help me, I can help you." *Id.*

IN LIMINE RULING ON ER 404(b) EVIDENCE

Within a few months after filing the charges, the State provided notice of its intent to introduce ER 404(b) evidence of an allegation of sexual misconduct by Mr. Chavez committed against a woman about 10 years before the charged offenses. The woman, Lacy Lovell, had come forward after reading about the charges against Mr. Chavez in the newspaper. She told law enforcement that when she was 16 years old, she was at a friend's home with Mr. Chavez, who she believed was then 18, when he asked if she wanted to take a drive in his truck. Mr. Chavez took Ms. Lovell somewhere in the woods. Mr. Chavez wanted to have sex with Ms. Lovell. Although she did not want to, Mr. Chavez was "nagging" her and "'wouldn't let up.'" Clerk's Papers (CP) at 309.

10

Ms. Lovell felt helpless and believed Mr. Chavez would not take her home if she did not have sex with him. Eventually they had sex.

Ms. Lovell told her sister and mother what happened not long thereafter, but she did not report it to the police until February 2017 when she heard about this case. The State argued that evidence of the incident was admissible as evidence of a common scheme or plan under ER 404(b). It argued that like the charged offenses, Mr. Chavez used a vehicle to take the victim to a secluded area before raping her. The court ruled the evidence admissible.

TRIAL

At Mr. Chavez's jury trial, the State's support for the testimony provided by Heather and Mattie included evidence from Betty Goad, who owned the furnished one bedroom guest apartment, rented to Mr. Chavez's wife, where Mr. Chavez committed the rape that the State characterized in argument as count III. Ms. Goad identified photographs of the apartment and testified to its small size and the fact that when it was being lived in by the Chavezes, they put bunk beds in the living room area for their two little girls. This was consistent with Heather's testimony that when Mr. Chavez took her to where he lived, before entering his and his wife's bedroom, Heather saw his children's bed and toys in the living room.

The evidence included Heather's cousin's and Mr. Buckley's testimony that Mr. Chavez pulled down Heather's pants and touched her sexually when she was being driven home, postcarnival, in May 2016.

It included the testimony of Mattie's mother, who, before allowing her daughter to go to the pep rally after-party and the party to which Mr. Chavez invited Mattie the following week, insisted on confirming that there would be adult supervision. She testified that Mr. Chavez called her on both occasions and told her that he was 22 years old and would be present.

It included the testimony of Clallam County Sheriff's Deputy Brandon Stoppani that consistent with Mattie's testimony, he encountered Mr. Chavez and a slender girl in her early teens parked in Marilyn Nelson Park on the night of September 28, 2016. He was on patrol, enforcing a county ordinance that did not permit parking in the area after dark. He called in the registration of Mr. Chavez's vehicle before approaching it, and in speaking with Mr. Chavez, realized Mr. Chavez formerly worked with the deputy's wife. The deputy described the young teenager as appearing happy, and he recalled that she commented on his English accent. He was not concerned about the safety of the girl. He assumed—given the age difference between her and Mr. Chavez—that she was Mr. Chavez's daughter.

The State called Ms. Lovell to testify to her accusation that Mr. Chavez had pressured her into having sex 13 years earlier. The trial court prefaced her testimony

12

with a limiting instruction that the jury should consider her evidence "only for the purpose of showing a common scheme or plan." RP at 365. Ms. Lovell acknowledged that Mr. Chavez did not physically force her to have sex, hit her, or hurt her, and that she never told Mr. Chavez, "no." RP at 381. But she testified that she was a virgin and she was "really upset" as the sex was occurring and wanted it to be over. RP at 375.

Finally, the State called Jesse as a witness. He admitted that when interviewed by detectives in February 2017, he told them that on the postcarnival drive home in May 2016, Mr. Buckley told him to pull over "because Nathan was being weird." RP at 274. He also told the detectives that when Mr. Buckley said that Mr. Chavez was being weird, Jesse thought that something sexual was going on with Heather.

At the close of the State's evidence, the defense moved to dismiss the special allegation of abuse of trust in counts I through IV. The State relied on Mr. Chavez's position as a trustee of the church for the special allegation. The defense argued the State had presented minimal evidence of Mr. Chavez's role as trustee, and Heather's testimony when cross-examined established that none of her dealings with Mr. Chavez were related to his position in the church. The trial court denied the motion.

Mr. Chavez and Jesse testified in Mr. Chavez's defense. Mr. Chavez denied that he had ever had sexual contact with Heather, Mattie, or Ms. Lovell. He testified that in 2015, he was elected to be a church trustee, which involved counting donations on

13

Sunday. He stated that being trustee did not involve interacting with parishioners, preaching, leading bible studies, or leading youth group.

Mr. Chavez testified that he did not attend the 2014/2015 New Year's Eve party at the church and celebrated instead at McDonald's with his wife and some friends. He stated that Heather texted him that night, but he did not meet up with her. He also stated that Heather texted him on another occasion to ask if he needed a babysitter and he told her to talk to his wife.

He testified he knew where Heather lived because he had given her a ride home from church. He denied ever having knocked on her window or entered her home.

He testified that Heather had probably been to his and his wife's apartment because he and his brothers often bring friends to each other's houses. He did not specifically remember Heather being at his home but testified he was never alone with her there.

As for the child molestation that allegedly occurred as Jesse drove guests home from the postcarnival party at Isaac's house, Mr. Chavez testified that he recalled a party at Isaac's that was attended by Heather, her cousin, and Mr. Buckley. He denied giving alcohol to anyone at the party. He testified that Heather's cousin was "hammered" and when the party ended, Heather was persistent that he should leave with her group. RP at 479. He testified that while riding in the bed of the truck, Heather was very drunk and was reaching out to Mr. Buckley. He stated it was he, Mr. Chavez, who yelled for Jesse

14

to stop the truck and drop him off, because he "didn't want to be with these drunk kids." RP at 482. He claims that after Jesse stopped at his request, he got out of the truck and walked home.

Mr. Chavez testified that he went to high school with Ms. Lovell, and they had a relationship when he was a senior and she was a freshman. Mr. Chavez remembered being parked in his truck in front of the home of the friend identified by Ms. Lovell and that they might have been "making out." RP at 505. He testified they were going to have sex but did not, because other people were there and it was not the right time. Mr. Chavez said he did not take her on the drive she described and they did not have sex that day.

When called as a defense witness, Jesse supported Mr. Chavez's testimony that in driving home from the postcarnival party, he pulled over because Mr. Buckley told him Mr. Chavez wanted to get out. Jesse admitted under cross-examination that a year before trial he told police he believed Mr. Chavez "was trying to be sexual with [Heather]," meaning that Mr. Chavez was trying to pull Heather's pants down and touch her vagina. RP at 617. In redirect examination, Jesse testified that he did not see it happen and he had since "learned things about the girls and everything, so [his] thoughts have changed on it." RP at 649.

The jury found Mr. Chavez not guilty of count V (the alleged rape of Mattie following the bonfire at Slab Camp), but guilty of the remaining charges. The jury also

15

found Mr. Chavez abused a position of trust in committing counts I, II, and III, but not count IV.

The State's sentencing memorandum asked the court to impose an exceptional aggravated sentence by running consecutively the sentences on counts I, II, and III—the counts the jury found were facilitated by Mr. Chavez's use of a position of trust—and running those concurrently with the remaining sentences. The result would be a total period of confinement of 180 months. The State pointed out that an exceptional aggravated sentence was also justified on "free crimes" grounds, because three of the rape counts, standing alone, would support the 60 month maximum sentence for a class C felony.

Among community custody conditions requested by the State was one prohibiting Mr. Chavez from contacting or communicating with minors under the age of 16 years old, unless authorized by his community corrections officer and therapist and accompanied/supervised by an approved chaperone.

Mr. Chavez opposed the imposition of an exceptional sentence and asked that the prohibition on communication with minors be amended so he could have contact with his biological children.

The trial court agreed to impose an exceptional sentence, but selected different crimes to run consecutively, one for each victim: count I (Heather), count VI (Mattie) and count VII (Mr. Buckley or the judicial system). The court signed findings of fact and

16

conclusions of law in support of the exceptional sentence that had been proposed by the State. It modified the community custody condition dealing with contact with minors by adding the language, "While incarcerated, the Defendant may communicate and visit with his biological children." CP at 50.

Mr. Chavez appeals.

ANALYSIS

Mr. Chavez makes nine assignments of error that we analyze as raising seven issues: (1) whether the court abused its discretion in admitting the testimony of Ms. Lovell, and whether, if there was error, it was harmless; (2) whether there was insufficient evidence of tampering with a witness; (3) with respect to the abuse of trust aggravator, whether it was supported by sufficient evidence, whether in finding sufficient evidence, the trial court relied on facts not found by the jury, and whether it was an abuse of discretion to rely on abuse of trust to impose an exceptional sentence; (4) whether the convictions for counts II and III constitute double jeopardy; (5) whether the court erred in relying on the "free crimes" doctrine to impose an exceptional sentence; (6) whether findings of fact in support of the exceptional sentence were not based on jury findings; and (7) whether the court violated Mr. Chavez's fundamental right to parent by prohibiting him from having contact with his children on his release from prison. We address the issues in the order stated.

17

I.    EVEN IF IT WAS AN ABUSE OF DISCRETION TO ADMIT MS. LOVELL'S TESTIMONY,
ANY ERROR WAS HARMLESS

Mr. Chavez contends the court erred when it allowed Ms. Lovell's testimony as evidence of a common scheme or plan.

"ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith."  *State v. Slocum*, 183 Wn. App. 438, 448, 333 P.3d 541 (2014).  The rule permits the use of such evidence for other purposes, however, among them being to prove a common scheme or plan.  *State v. Sutherby*, 165 Wn.2d 870, 887, 204 P.3d 916 (2009).  Before admitting evidence of other crimes or wrongs that jurors might misuse as demonstrating criminal propensity, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the permitted purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against its prejudicial effect.  *Slocum*, 183 Wn. App. at 448 (citing *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012)).

To establish a common scheme or plan for ER 404(b) purposes, "the evidence of prior conduct must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct are the individual

18

manifestations." *State v. Lough*, 125 Wn.2d 847, 860, 889 P.2d 487 (1995). "Random similarities are not enough," and "the degree of similarity . . . must be substantial." *State v. DeVincentis*, 150 Wn.2d 11, 18, 20, 74 P.3d 119 (2003).

Appellate review of a trial court's evidentiary rulings is for an abuse of discretion. *Slocum*, 183 Wn. App. at 449. "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons, i.e., if the court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *Id.* (quoting *State v. Hudson*, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009)).

In the State's written submission addressing its intent to offer Ms. Lovell's evidence, the State characterized the common scheme or plan as:

> Begin[ning] with compliments and paying special attention to the victim followed by supplying the alcohol for the invariable party. After the child is intoxicated, [Mr. Chavez] proceeds to separate them from the pack to have sexual intercourse. Consistently he violates these children in his vehicle or the vehicle of another and he tends to gravitate to . . . secluded wooden areas where they are less likely to get caught.

CP at 297. Its offer of proof did not say, nor did Ms. Lovell testify, that she was groomed with prior compliments and special attention. Nor did she claim to have been provided with alcohol or taken to a party. In this case, Heather did not claim she was provided with alcohol before any of the rapes. And only one of the rapes of Heather took place in a vehicle.

Later, when the motion was argued, the State characterized the common scheme or plan as:

> [H]e isolates them, takes them up into a wooded area and then has sex with them, makes them feel as if they cannot leave. [Ms. Lovell] was under age at the time and it is very similar to what we have in the other allegation.

RP at 8. Unlike Ms. Lovell, who acceded to Mr. Chavez's persistence because she felt left with no choice, Heather and Mattie both testified that the sexual relations were consensual. Neither testified that she acceded to sex because she felt isolated and that she could not leave. And Ms. Lovell was 16, the age of consent, at the time Mr. Chavez took advantage of her.

Given these differences, the only commonality in the evidence found by the trial court, but a commonality it viewed as sufficient, was that "it establishes a plan or design, to rape." RP at 12. In *Slocum*, this court held that proof of a common plan "to molest children" did not qualify for the "common scheme or plan" exception to ER 404(b). 183 Wn. App. at 452-53.

The most substantial similarity between Ms. Lovell's account and a crime charged in this case is that in Ms. Lovell's case, as with the rape of Mattie charged as count VI, the women accepted Mr. Chavez's invitation to go four-by-fouring, and the sex took place thereafter, in the isolated off-road area at the end of the ride. In Mattie's case, however, the four-by-fouring took place a week after she testified to having consensual sex with Mr. Chavez, had then accepted his invitation to meet him at a party, left the

party with him, traveled to a boat ramp area where they continued to drink, and went four-by-fouring only after Mr. Chavez was told by a deputy sheriff to move on. And unlike Ms. Lovell, Mattie testified that the sex was consensual.

We are dubious that the degree of similarity was substantial, as argued by the State. Given the abuse of discretion standard, however, we resolve this assignment of error on the basis that any error was harmless. We do not discount Ms. Lovell's testimony about how upset she was by a sexual encounter she did not want and the enduring indignation that prompted her to come forward to support the victims in this case. Still, given that she was of the age of consent, her evidence presented what jurors would have to evaluate as a more ambiguous situation—particularly given her candid admission that despite the distress she experienced as the sex occurred, it was not forcible and she did not verbally object.

A defendant charged with child rape can deny that sex took place. But if it is proved that sex *did* take place between a 28- or 29-year-old man and a 14-year-old girl to whom he was not married, the crime has been proved. *See* RCW 9A.44.079.

Here, the two victims testified that sex did take place. And there was corroborating evidence for the testimony of the two victims, who had no apparent motive to lie. Mr. Buckley and Heather's cousin witnessed Mr. Chavez's molestation of Heather charged in count IV, and the molestation on that occasion tended to support her claim that she and Mr. Chavez had a sexual relationship in the past. Deputy Stoppani corroborated

21

Mattie's testimony that Mr. Chavez parked with her at the boat ramp before the rape

charged as count VI, and Mr. Chavez offered no explanation at trial for having parked

after dark with a slender girl in her early teens. The evidence of witness tampering,

discussed below, implies consciousness of guilt. And while Jesse was a reluctant witness

against his brother, he confirmed that Mr. Chavez, while age 28 or 29, was partying with

high school students, and provided rides home to both Heather and Mattie. Jesse also

confirmed that following the alleged molestation of Heather in the bed of his truck, he

pulled over at Mr. Buckley's request and left Mr. Chavez on the roadside.

Under the applicable nonconstitutional harmless error test, the question is whether

within reasonable probabilities, the outcome of the trial would have been materially

affected had the error not occurred. *Slocum*, 183 Wn. App. at 456 (citing *Gresham*, 173

Wn.2d at 433). There is no reason to believe that the outcome of the trial would have

been different had Ms. Lovell not testified.

II.     THE EVIDENCE OF WITNESS TAMPERING WAS SUFFICIENT

Mr. Chavez contends the State presented insufficient evidence to support his

conviction for witness tampering.

The test for sufficiency of the evidence is "whether, after viewing the evidence in

the light most favorable to the State, any rational trier of fact could have found guilt

beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068

(1992).  All reasonable inferences from the evidence are drawn in favor of the State and are interpreted strongly against the defendant.  *Id.*

Under RCW 9A.72.120,

(1) A person is guilty of tampering with a witness if he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding or a person whom he or she has reason to believe may have information relevant to a criminal investigation or the abuse or neglect of a minor child to:
        (a) Testify falsely or, without right or privilege to do so, to withhold any testimony. . . .

Mr. Chavez likens his case to *State v. Rempel*, 114 Wn.2d 77, 83, 785 P.2d 1134 (1990), in which part of the reasoning by which the Supreme Court found insufficient evidence of witness tampering was that the defendant's "literal words [did] not contain a request to withhold testimony" and contained "no express threat nor any promise of reward." *Id.* Rempel, who was found guilty of the attempted rape of a woman with whom he had been friends for years, had called the victim after charges were filed, apologized, asked that she "'drop the charges,'" and told her "'it'" was going to ruin his life. *Id.* The court concluded that the entire context, including the parties' prior relationship and the reaction of the victim (who was unconcerned about the calls, which were not going to affect her actions), "negates any inference that the request to 'drop the charge' was in fact an inducement to withhold testimony from a later trial." *Id.* at 84. Rather, the defendant's request "reflect[ed] a lay person's perception that the complaining witness can cause a prosecution to be discontinued." *Id.* at 83. The court

23

made clear that "an attempt to induce a witness to withhold testimony does not depend only upon the literal meaning of the words used," and "[t]he State is entitled to rely on the inferential meaning of the words and the context in which they were used." *Id.* at 83-84.

Here, Jesse presented Mr. Buckley with the surprisingly generous gift of an iPhone, followed shortly by Mr. Chavez approaching Mr. Buckley to ask that he talk to Heather and her cousin and get them to "quit lying," followed by words to the effect of, "[Y]ou can help me, I can help you." RP at 350. Nothing about the context negates the inference, which can be reasonably drawn, that Mr. Buckley was being asked to withhold and cause his friends to withhold testimony. The evidence was sufficient.

III.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE ABUSE OF TRUST AGGRAVATOR

Mr. Chavez challenges his exceptional sentence, under which his sentences for three counts run consecutively. He contends that the abuse of trust aggravator was not supported by the evidence; that in finding sufficient evidence for abuse of trust, the trial court relied on facts not found by the jury, and that it was an abuse of discretion for the trial court to rely on abuse of trust to impose an exceptional sentence. Because we agree with the evidence sufficiency challenge, we need not address the second and third contentions.

Generally, sentences for multiple current offenses, other than serious violent offenses, run concurrently. RCW 9.94A.589(1)(a)-(b). Consecutive sentences for

24

multiple current offenses that are not serious violent offenses are thus exceptional. *State v. Newlun*, 142 Wn. App. 730, 735 n.3, 176 P.3d 529 (2008). An exceptional sentence for convictions not involving serious violent offenses may only be imposed under the exceptional sentence provisions of RCW 9.94A.535. RCW 9.94A.589(1)(a).

One of the trial court's grounds for imposing the exceptional sentence was the jury's special verdicts on counts I through III, finding that the defendant used his position of trust to facilitate the commission of the crime, an aggravating factor authorized by RCW 9.94A.535(3)(n). Whether the State proved a special allegation to support an exceptional sentence "'is a factual inquiry, the [jury's] reasons will be upheld unless they are clearly erroneous.'" *State v. Hale*, 146 Wn. App. 299, 307, 189 P.3d 829 (2008) (alteration in original) (quoting *State v. Fowler*, 145 Wn.2d 400, 405, 38 P.3d 335 (2002)). Substantial evidence for this purpose is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises. *State v. Jeannotte*, 133 Wn.2d 847, 856, 947 P.2d 1192 (1997).

Here, when the defense moved to dismiss the aggravator at the close of the State's case, it argued that the State's only evidence that Mr. Chavez used a position of trust was a corporate filing identifying Mr. Chavez as a church officer. It pointed out that when cross-examined, Heather's testimony was that

> Mr. Chavez never escorted her to a pew, was never Bible study [sic], never counseled her, never preached to her, never did anything that would

25

> constitute a position of trust.  She even said on cross examination that he
> was just like any other church member that went to that church.

RP at 459-60.  The court denied the motion, observing that the State can prove the

aggravator by demonstrating a trust relationship with an organization that has assigned

functions to a defendant.[8]

The concept that the aggravator can apply when a victim trusts an organization

was explained in *State v. Harding*, 62 Wn. App. 245, 248-49, 813 P.2d 1259 (1991).  In

that case, the victim was raped by the defendant, who entered her apartment while she

slept.  The defendant was the son of one of the apartment managers and occasionally

worked cleaning apartments.  *Id.* at 246.  In connection with his duties, he was given a

master key that opened all of the apartment doors.  *Id.*  Common law violation of a

position of trust was alleged in support of an exceptional sentence.  *Id.* at 247.  In

response to the argument on appeal that there was no direct, personal relationship of trust

between the victim and the defendant, the court explained, "In our modern world, people

routinely put their trust in organizations (such as the management of an apartment

---

[8] The court also observed that the relationship of trust began when Mr. Chavez indicated a willingness to consider Heather as a babysitter for his children, citing comments to the pattern jury instruction on the aggravator that talk about babysitters. But the comments discuss the relationship of trust between babysitters and the children entrusted to their care.  *See* Comment, 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 300.23, at 803-05 (4th ed. 2016).

complex) without knowing the individuals who will carry out the tasks entrusted to the organization." *Id.* at 249.

It was reasonable for the State to contend that Heather placed her trust in her church. But what the State did not prove is Heather's reliance on the church for a function that it then delegated (along with the associated obligation of trust) to Mr. Chavez. Moreover, unlike the *common law* violation of trust that could support an exceptional sentence, the *statutory* aggravator, adopted in 2005, required that Mr. Chavez use the delegated function to facilitate commission of his offense. *Compare* RCW 9.94A.535(3)(n) *with State v. Chadderton*, 119 Wn.2d 390, 398, 832 P.2d 481 (1992). The State points only to evidence that Heather was attending the church when she met Mr. Chavez, he spoke to her at church, she knew he was an usher, and she left a church function to meet him on the night that he first raped her. As Heather testified at trial, though, even in his usher capacity, Mr. Chavez never escorted her to her seat and he never "use[d] his position as an usher" in their encounters. RP at 140.

Many would view any rape of a child as involving an abuse of trust, because adults should be protectors of children, not predators. But to justify an exceptional sentence, the conduct must be more culpable than that inherent in the crime. *Chadderton*, 119 Wn.2d at 398. The evidence was insufficient to support the jury's special verdicts finding that Mr. Chavez used his position of trust to facilitate the crimes charged in counts I through III.

27

IV.     CONVICTIONS ON COUNTS II AND III DO NOT VIOLATE CONSTITUTIONAL
        PROTECTIONS AGAINST DOUBLE JEOPARDY

Mr. Chavez contends that convictions on counts II and III constitute double jeopardy because both accused him of the third degree rape of Heather during the same time frame, and the jury was not instructed that it must find a separate act for each count.

Where a defendant is charged with multiple counts of the same crime, vague jury instructions, coupled with evidence and argument that fail to make it manifestly apparent that the State is not seeking to impose multiple punishments for a single offense, violate federal and state constitutional guarantees against double jeopardy. *See* U.S. CONST. amend. V; WASH. CONST. art. I, § 9. "A double jeopardy claim is of constitutional proportions and may be raised for the first time on appeal." *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011).

When reviewing this type of double jeopardy claim, we engage in a two-step, de novo review. We first consider whether the jury instructions permitted the jury to convict a defendant of multiple counts based on a single act. *Id.* at 661-63. If the instructions are flawed in this respect, we proceed to the second step and examine the entire trial record rigorously, in favor of the defendant, to ascertain whether there are potentially redundant convictions. *Id.* at 664. "[I]f it is not clear that it was 'manifestly apparent to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act, there is a double jeopardy violation." *Id.*

28

(emphasis omitted) (second alteration in original) (quoting *State v. Berg*, 147 Wn. App.

923, 931, 198 P.3d 529 (2008), *overruled on other grounds by Mutch*, 171 Wn.2d 646).

Here, instructions 10 and 11, the elements instructions for counts II and III, were

identical apart from their reference to the two different counts. The State points to

instruction 3, a "separate charges" instruction, as ensuring against redundant

convictions.[9] But the identical instruction was found inadequate in *Mutch* because it does

not explain to jurors that each "crime" requires proof of a different act. 171 Wn.2d at

662-63. Mr. Chavez demonstrates that looking only at the instructions, double jeopardy

was possible.

At the next stage of the analysis, however, the evidence and argument of counsel

made it manifestly apparent to the jury that the State was not seeking to impose multiple

punishments for the same offense. The prosecutor consistently tied specific incidents to

specific counts. In closing argument, he had names for most of the incidents, which he

used consistently.[10] He walked through the counts consecutively, identifying which

conduct went with which charge. Even the defense tracked the State's correlation of

different incidents with different counts, stating at one point, "There are four accusations

---

[9] The instruction stated, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 197.

[10] "New Year's count," "[Heather's] house charge," "incident at Slab Camp," "friend's house event," and "incident at his house." RP at 713, 714, 720, 723, 727.

that [Heather] has made against my client. My client has four charges against him as a result of that." RP at 736. The defense also discussed the "New Year's Eve incident," "[Heather's] house incident," the "allegation . . . where Mr. Chavez allegedly drove [Heather] to his home," and the "[f]ourth incident . . . at Isaac's house." RP at 736-38, 740. Finally, in his closing rebuttal argument, the prosecutor presented a chart to help clarify "which counts are what and who's involved." *See* RP at 771-77.

Viewing the entire trial record, the jurors could not have mistakenly believed that they could convict Mr. Chavez of multiple counts based on a single act.

V.     THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE FREE CRIMES AGGRAVATOR, BUT IT IS NOT CLEAR THAT THE COURT WOULD HAVE IMPOSED THE SAME EXCEPTIONAL SENTENCE ON THAT BASIS ALONE

Mr. Chavez argues the statutory "free crimes" aggravator did not justify an exceptional sentence because his offender score already included triple points for his sex offenses.

At the time of sentencing, Mr. Chavez had no scorable prior offenses, so he began with an offender score of zero. He was convicted of five sex offenses, which—being separate offenses—were each scored as "other current offenses" at three points each, in addition to the one point scored for his witness tampering conviction. *See* RCW 9.94A.525(17).

As the State pointed out in requesting an exceptional sentence, had Mr. Chavez been convicted of only three sex offenses and no other crimes, he would have had an

offender score of nine and a standard range of 60 months—the statutory maximum for his

sex offenses, which were all class C felonies. Without exceptional consecutive

sentencing, he would have served no additional time for the other two sex offenses and

witness tampering.

RCW 9.94A.535(2)(c) provides that the trial court may impose an aggravated

exceptional sentence where "[t]he defendant has committed multiple current offenses and

the defendant's high offender score results in some of the current offenses going

unpunished." Whether the trial court had authority to impose an exceptional sentence is

reviewed de novo.

Mr. Chavez argues that "[u]sing the multiplier means [he] was punished for his

offenses, which were factored in when determining his offender score." Opening Br. of

Appellant at 41. Use of the multiplier accomplished the legislative objective of punishing

repeated sex offenses more harshly until an offender score of nine was reached. But once

that score was exceeded, use of the multiplier did not accomplish the legislative

objective.

In arguing that application of the multiplier alone accomplishes the legislative

objective, the only authority Mr. Chavez cites is *State v. Phelps*, No. 76209-5-I, (Wash.

Ct. App. Mar. 5, 2018), an unpublished opinion.[11] *Phelps* is distinguishable. In that case,

---

[11] https://www.courts.wa.gov/opinions/pdf/762095.PDF.

the defendant pleaded guilty to two crimes: taking a motor vehicle without permission in the second degree, and hit and run injury accident. His offender score for the motor vehicle taking charge was elevated to 19 by the multiplier effect of his prior stolen car convictions. Even so, his standard range for the hit and run count, for which his offender score was only 6, was longer, because hit and run was the more serious offense. Looking at his presumptive sentence—the 33 to 43 month range for the hit and run—his motor vehicle taking would *not* go unpunished, because that crime increased his offender score for the hit and run.

Here, absent an exceptional sentence, Mr. Chavez's presumptive sentence would be one of the sex offenses, and because his offender score reached nine by counting only two of his other offenses, his remaining three crimes would go unpunished. The free crimes aggravator was properly applied.

The question remains whether we can affirm the exceptional sentence despite having found insufficient evidence to support the abuse of trust aggravator. If we were persuaded that a trial court would have imposed the same sentence on the basis of the free crimes doctrine alone, we could uphold the exceptional sentence regardless of the validity of the abuse of trust aggravator. *State v. Hughes*, 154 Wn.2d 118, 134, 110 P.3d 192 (2005), *overruled on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006).

Looking closely at the trial court's statements at sentencing, it explained it was running three sentences consecutively "because of the aggravators under the situation and basically because of the free crimes doctrine." RP at 846. It is clear the court would have imposed a consecutive sentence for the witness tampering count, because the court used that count as an example of a free crime, stating that concurrent sentencing "would leave the possibility of oh, gee, you can go out and tamper with witnesses but you'll never get a greater sentence because that's a different crime." RP at 847. It is less clear that the court would have run the three sentences consecutively based on the free crimes aggravator alone, although it was authorized to do so.

Often, sentencing courts will state that any one of multiple aggravating circumstances, standing alone, would support the exceptional sentence imposed. Because we do not have that clarity here, we will remand for resentencing, at which the court may impose the same or a different sentence.[12]

---

[12] By remanding for resentencing, we need not address the second of Mr. Chavez's two assignments of error complaining that the trial court's findings of fact in support of the exceptional sentence include findings not made by the jury. *See* Opening Br. of Appellant at 2 (Assignment of Error 8). At resentencing, the only finding on which the trial court may rely for an exceptional sentence beyond the prescribed statutory maximum is the fact that his high offender score results in some of his current offenses going unpunished. *See Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

VI.   MR. CHAVEZ CAN RAISE HIS CHALLENGE TO THE COMMUNITY CUSTODY
CONDITION LIMITING ACCESS TO MINORS AT RESENTENCING

Mr. Chavez finally contends that the community custody condition limiting his

communication or contact with minors under the age of 16 years old violates his

constitutional right to have a relationship with his children.

There was testimony at trial that Mr. Chavez has four children, whose ages at the

time of trial were between 2 and 8.  The two oldest children are girls, and the younger

two are boys.

The State requested a community custody condition that prohibits contact or

communication with minors under the age of 16 years old "unless previously authorized

by your [community custody officer] and [sex offender treatment provider] therapist and

accompanied/supervised by an approved adult chaperone."  CP at 50.  Mr. Chavez asked

in his sentencing memorandum that he be able to "have communication with his

biological children while in a State Facility, be able to write to them while he is

incarcerated, and to be able to see them when he gets out."  CP at 95.  At sentencing, the

court said, "I . . . will allow you to have, certainly contact with your own children while

you are incarcerated."  RP at 848.  It modified the State's proposed community custody

condition by adding the language, "While incarcerated, the Defendant may

communicate and visit with his biological children." CP at 50. Mr. Chavez complains that the modification fails to address his desire for contact with his children following his release from confinement.

"An offender's usual constitutional rights during community placement are subject to [Sentencing Reform Act]-authorized infringements." *State v. Hearn*, 131 Wn. App. 601, 607, 128 P.3d 139 (2006). But "[c]onditions interfering with fundamental rights, such as the right to a parent-child relationship, must be 'sensitively imposed' so they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" *State v. Torres*, 198 Wn. App. 685, 689, 393 P.3d 894 (2017) (quoting *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 374, 229 P.3d 686 (2010)). The sentencing court has a "duty to balance the competing interests impacted by" a condition infringing on a fundamental right. *Id.* at 690.

Mr. Chavez asks us to order the condition struck, but striking the condition would allow Mr. Chavez to have contact with all children. And since the trial court was aware of Mr. Chavez's request and granted it only in part, it is possible the court wanted some postrelease limitations in place, particularly if Mr. Chavez might be released at a time when his daughters are in their early or mid-teens. Since we are remanding for resentencing, Mr. Chavez will have an opportunity to ask the court to revisit the condition.

We affirm the convictions and remand for resentencing in accordance with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lee, C.J.

_____
Maxa, J.