IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31237-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES BEN SLOCUM, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Evidence of a criminal defendant's prior bad acts "is objectionable not because it has no appreciable probative value but because it has too much." 1A JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 58.2, at 1212 (Peter Tillers rev. ed. 1983). It presents a danger that the defendant will be found guilty not on the strength of evidence supporting the current charge, but because of the jury's overreliance on past acts as evidence of his character and propensities. This potential for prejudice from admitting prior acts is "'at its highest'" in sex offense cases. *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012) (quoting *State v. Saltarelli*, 98 Wn.2d 358, 363, 655 P.2d 697 (1982)).

Charles Slocum was convicted of the first degree child molestation and third degree child rape of his step-granddaughter based in part on the testimony of the girl's

mother and her paternal aunt that Mr. Slocum had molested them decades earlier, when they were adolescents. Yet the evidence demonstrated that Mr. Slocum's prior acts were mostly opportunistic; the only common "plan" that could possibly be ascribed to *all* of them was a plan that, if presented the opportunity, Mr. Slocum would molest girls. Something that amorphous is not a plan within the meaning of ER 404(b); it is a criminal propensity. Because the error in admitting evidence of two prior acts of opportunistic molestation was not harmless, a new trial is required.

We reverse the judgment and sentence and remand for a new trial consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND

In August 2011, Charles Slocum was accused by his 15-year-old step-granddaughter, W.N., of inappropriate touching. W.N. alleged that beginning at the age of 3 or 4, during visits to her grandparents' home, Mr. Slocum rubbed her vagina and breasts, both over and under her clothing. Initially, W.N. told her parents and investigators that the molestation stopped when she was 11 years old.

Mr. Slocum was charged with child molestation in the first degree. He originally pleaded not guilty but later agreed to enter a plea of guilty. According to his trial lawyer, this was with the encouragement of Mr. Slocum's wife, who did not want W.N. to have to testify, and was based upon W.N.'s family's reported support of Mr. Slocum's request

2

that, if eligible, he be sentenced under the special sex offender sentencing alternative (SSOSA), RCW 9.94A.670(2).

After entry of Mr. Slocum's guilty plea, W.N.'s family learned from her that the touching continued beyond her 12th birthday and that as recently as April 2011, when she was 14 years old, Mr. Slocum molested her in a family travel trailer. On this last occasion, he had inserted his fingers into her vagina.

Following that revelation, W.N.'s family withdrew its support for a SSOSA sentence, which the State reported to the defense. Mr. Slocum moved to withdraw his guilty plea, his motion was granted, and the State then amended its information to enlarge the period covered by the child molestation charge and add a charge of rape of a child in the third degree. Mr. Slocum proceeded to trial on both charges.

Before trial, the court conducted a hearing on the State's motions in limine, which included a motion that the court admit evidence that Mr. Slocum had sexually abused W.N.'s mother and paternal aunt many years earlier. The State argued that the evidence was admissible under ER 404(b) as evidence of a common scheme or plan, and specifically,

> a plan to molest children. The defendant would find victims he had access to and would abuse them in his home. He would perform the same type of abuse on similar aged children. Lastly, he was in the same position of authority over each child.

Clerk's Papers (CP) at 96.

3

The State did not call W.N. as a live witness at the hearing on its motion; instead, it offered police reports of interviews indicating what her anticipated testimony would be. The police report indicated that W.N. told detectives that up until the time she was 11 or 12 years old, Mr. Slocum would frequently rub her vaginal area anytime her grandmother was not around. The police report indicated that when asked how Mr. Slocum would touch her, W.N. told them,

> [H]e would call her over to sit in his lap so he could talk to her. He always sits in his recliner. He would always rub her while he talked to her. He acted like it wasn't a big deal. . . . She demonstrated how he would rub by placing her hand between her legs and rubbing up and down with her fingers in the vaginal area. He would do this for about 5 minutes each time.

CP at 100.

Her subsequent revelation was that sometime in December 2010, when she was 14, Mr. Slocum touched her clothed crotch and breast area; she believed that once again, she had been sitting on his lap. Nothing else happened until Sunday, April 3, 2011, when he entered while she was cleaning her grandparents' travel trailer, locked the door, pushed her down on the couch, and touched her vagina and breasts, both outside and inside her clothing, inserting his fingers in her vagina.

The State called W.N.'s mother and aunt to testify at the hearing on its motion to admit evidence of the prior acts.

W.N.'s mother testified that her parents divorced when she was 7 years old and her mother married Charles Slocum a year or two later, when W.N.'s mother was about 8

4

or 9. She testified to two incidents of sexual molestation by her stepfather, both of which occurred when she was about 12 years old. According to dates established by testimony at trial, the incidents occurred in or about 1981.

In the first incident, W.N.'s mother was lying on the floor of their home with a blanket, watching television, when, according to her:

> [H]e, um, ended up coming down on the floor with me, um, was under the blanket, and I know I had a shirt and a bra on. At first he took my shirt off. I know both my arms were out of my shirt. I don't recall if it was over my head or not. Um, and then he took my bra off and, um, had his hands on my breasts.

Report of Proceedings (RP) (Sept. 10, 2012) at 23. He then rubbed her breasts, although she was unable to say for how long.

In the second, she was also at home and in the same room with her stepfather, who was sitting in a recliner and asked her to sit on his lap. She testified:

> I had shorts on, and I sat on his lap, um, and as I recall he had his hand on my stomach at first and was rocking. And as he rocked, his hand just kept going lower and lower until it was rubbing on the outside of my vagina on my shorts and just continued to rock and rub.

*Id.* at 24. She estimated that the rubbing continued for about 20 minutes.

W.N.'s mother told a friend about the incidents not long after they occurred and the information got back to her mother, Ms. Slocum, who then asked her about the allegations. Ms. Slocum was called as a witness at the hearing and testified that she could recall the conversation with her daughter and while she could not recall "where

5

they were, . . . he obviously made her feel uncomfortable and that he was trying to take off her bra." *Id.* at 40. Ms. Slocum testified that she spoke with Mr. Slocum about her daughter's complaint. In a detective's report that the State submitted with its motion, the detective indicated that following this conversation with Ms. Slocum, Mr. Slocum did not touch W.N.'s mother again.

W.N.'s aunt testified to one incident of molestation by Mr. Slocum, which occurred when she was about 12; according to dates established by testimony at trial, this would have been in 1996 or 1997. She had gone with her brother (W.N.'s father) to swim at a pool in Mr. Slocum's and his wife's backyard. She testified that they were getting ready to go out swimming, when Mr. Slocum offered to help her put on sunscreen because she could not reach her back. She agreed and, according to her, Mr. Slocum explained that she was most likely to burn near the edge of her swimsuit and then used that explanation to reach under the edges of her swimsuit top, moving his hands around to her front, with his hands eventually placed on her breasts. She testified that she froze and was uncomfortable but that he did not have his hands on her breasts for very long.

After hearing the testimony and argument of the lawyers, the trial judge ruled that he was persuaded by a preponderance of the evidence that the alleged molestation of W.N.'s mother and aunt had occurred, that he believed the incidents of their molestation demonstrated a common plan or design on Mr. Slocum's part to molest children, that he

found the evidence to be more probative than prejudicial, and that he would admit the evidence for the purpose of proving a common scheme or plan.

At trial, the State offered the evidence of investigating officers and other individuals to whom W.N. had reported the molestation, W.N.'s mother and aunt, and W.N.

In defending against the charges, Mr. Slocum sought unsuccessfully to offer a recorded statement he had made to police when he was first asked to come in and answer questions about W.N.'s allegations, in which he denied ever touching W.N. inappropriately. He offered his own testimony and that of Ms. Slocum that he had suffered a life-threatening pancreas rupture in 1994 with extensive internal bleeding and organ damage, after which he had been impotent. According to Mr. Slocum, he ceased having sexual desire after that time. He offered evidence of W.N.'s original report to police investigators and others that his inappropriate touching had stopped when she was 11. Finally, he offered uncontroverted evidence that on April 3, 2011—the date that W.N. originally alleged he had molested her in the trailer—he had been hospitalized in Oregon for knee surgery. Anticipating this evidence of his hospitalization, the State had already presented evidence explaining why the April 3 date initially provided by W.N. was mistakenly off by a week.

The jury found Mr. Slocum guilty as charged and made a special finding that he had violated a position of trust in committing the crimes. He received an exceptional

sentence of 120 months on the molestation charge and 60 months on the child rape count. He appeals.

ANALYSIS

Mr. Slocum argues on appeal that the trial court erred in four respects: by (1) admitting evidence of Mr. Slocum's uncharged molestation of W.N.'s mother and aunt, (2) admitting cumulative evidence of multiple witnesses bolstering W.N.'s allegations, (3) refusing to allow Mr. Slocum to offer his statement to police denying W.N.'s allegations, and (4) finding the Mr. Slocum had the present or future ability to pay legal financial obligations imposed by the court without sufficient evidence or analysis to support the finding.

We conclude that the trial court's admission of the State's evidence of two of the three prior acts of molestation was based on the trial court's mistaken view or application of the law; was therefore an abuse of discretion; and, because the error was not harmless, requires a new trial. We address that error first and then touch on Mr. Slocum's other assignments of error briefly.

*I. Admission of evidence of a common scheme or plan*

ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. The same evidence may be admissible for other purposes, depending on its relevance and the balancing of the probative value and danger of unfair prejudice. *Gresham*, 173 Wn.2d

8

at 420. ER 404(b) includes a nonexclusive list of permissible purposes for admitting evidence of a person's other bad acts; among the permitted uses is as proof that a crime with which a defendant is charged is a manifestation of a plan that the defendant devised and has used in committing like crimes.

The burden of demonstrating a proper purpose for admitting evidence of a person's prior bad acts is on the proponent of the evidence. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Before admitting evidence of bad acts, the trial court is required to "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *Gresham*, 173 Wn.2d at 421 (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). It must conduct this analysis on the record. *State v. Sublett*, 156 Wn. App. 160, 195, 231 P.3d 231 (2010), *aff'd*, 176 Wn.2d 58, 292 P.3d 715 (2012).

Mr. Slocum argues that the trial court erred in determining that the allegations of W.N.'s mother and aunt were admissible for the purpose of proving that his alleged actions toward W.N. were manifestations of an ongoing plan of crime and in determining that the evidence was more probative than prejudicial.

We review a trial court's evidentiary rulings for an abuse of discretion. "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on

9

untenable grounds or for untenable reasons, i.e., if the court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *State v. Hudson*, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009). Mr. Slocum argues that the trial court abused its discretion by applying the wrong legal standard or, if we assume that it applied the correct legal standard, that its decision was nonetheless manifestly unreasonable given the lack of similarity between the prior acts and the charged crimes.

Over the last 20 years, the Washington Supreme Court has unquestionably enlarged the evidence of a defendant's prior bad acts that may be admitted as proof of a plan for committing crime sufficiently similar to the crime presently charged to justify admission under ER 404(b).

In *State v. Lough*, 125 Wn.2d 847, 889 P.2d 487 (1995), the Washington Supreme Court enlarged the evidence admissible under ER 404(b) when it resolved a split of authority in Washington over the type of evidence that could be offered for the purpose of proving a prior plan or scheme. According to the court, "The heart of the controversy involves the meaning of the word 'plan.'" *Id.* at 854.

The court stated that "[t]here is no question" that evidence of a prior crime or act is admissible in the situation where several crimes constitute parts of a defendant's overarching plan, and the State offers evidence of that overarching plan and the defendant's commission of the first criminal step as proof that the defendant committed

10

the second criminal step. *Id.* at 855. The closer issue was whether a defendant's prior criminal act should be admissible in the situation of an individual who "devises a plan and uses it repeatedly to perpetrate separate but very similar crimes." *Id.*

In *Lough*, the defendant, a paramedic knowledgeable about drugs, was charged with drugging a woman he was dating and then raping her. The State sought to offer testimony of four other women, each of whom had been involved in a relationship with Lough and each of whom claimed that he had surreptitiously slipped them drugs and then raped them. The court examined cases from other jurisdictions, representing what it characterized as the modern trend under the evidence rule, and concluded that "a common plan or scheme may be established by evidence that the Defendant committed markedly similar acts of misconduct against similar victims under similar circumstances." *Id.* at 852. It later elaborated:

> When a defendant's previous conduct bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design. To establish common design or plan, for the purposes of ER 404(b), the evidence of prior conduct must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct are the individual manifestations.

*Id.* at 860 (footnote and citation omitted). It recognized that "the result in these kinds of cases will be largely dependent on the facts of each case." *Id.* at 856.

11

The Supreme Court enlarged the admissibility of "common scheme or plan" evidence further in *DeVincentis*, 150 Wn.2d 11, where it once again resolved a split of Washington authority. Division Two of the Court of Appeals had interpreted *Lough* "to require that the similarities between the prior bad acts and the facts of the charged crime must be unique or uncommon to the way the crime is typically committed." *Id.* at 18 (citing *State v. Dewey*, 93 Wn. App. 50, 58, 966 P.2d 414 (1998)). Division One had disagreed, holding that uniqueness was not a requirement for admitting prior bad acts as evidence of a common scheme or plan. The Supreme Court agreed with Division One that Division Two had confused the common scheme or plan exception to ER 404(b) with the modus operandi exception to the rule, which requires evidence sufficiently unique and atypical of the way the crime is usually committed to serve as a "signature" and be probative of whether a crime was committed by a particular person.

While the split of authority was once again resolved in favor of admissibility by *DeVincentis*, it was with admonitions from the Supreme Court that "'caution is called for in application of the common scheme or plan exception,'" *id.* at 18 (quoting *State v. DeVincentis*, 112 Wn. App. 152, 159, 47 P.3d 606 (2002), *aff'd*, 150 Wn.2d 11); "[r]andom similarities are not enough," *id.*; "the degree of similarity . . . must be substantial," *id.* at 20; and "admission of this kind of evidence requires more than merely similar results." *Id.*

Driving home the importance of substantial similarity, the court pointed out that while the State had sought to offer testimony from several adolescent girls who accused DeVincentis of sexual misconduct, the trial court admitted the testimony of only one—the one who had been groomed for sexual contact in multiple steps similar to the victim whose molestation was then on trial.[1] According to the court, this discriminating approach by the trial court in deciding which, if any, prior acts were admissible exemplified that "[w]hen [the proper ER 404(b)] analysis is scrupulously applied by the trial court, it effectively prohibits mere propensity evidence." *Id.* at 23.

In trial proceedings in this case, the State characterized the Supreme Court's 2012 decision in *Gresham*, and in particular *State v. Scherner*, a case consolidated with *Gresham* before the Supreme Court, as going even further, and excusing virtually any requirement that a prior act offered as evidence of a common plan be substantially similar to the charged crime. It argued that case law supported "the State's present position that the defendant's prior sexual misconduct against [W.N.'s mother and aunt] may be

---

[1] Two concurring justices disagreed with the majority on the standard for similarity required to admit evidence as proof of a common scheme or plan, but all nine justices agreed that the prior victim whose testimony was admitted provided evidence that was admissible under either standard. The prior victim, like the victim in the case with which DeVincentis was presently charged, had met DeVincentis and been invited into his home through safe channels; he regularly appeared nearly naked in the presence of both girls and treated his appearance as normal, he later invited mutual massaging, he invited both into secluded spots in his home where he would ask them to undress and, later, masturbate him, and he warned both victims not to tell anyone or they would be in trouble.

13

admitted to show *the defendant's common scheme or plan to molest children.*" CP at 95

(emphasis added). It represented that in *Scherner,*

> Some of [the girls allowed to testify to the defendant's prior bad acts] the
> defendant was related to and some not. The sexual acts he performed were
> different and at different locations. Nonetheless, the Supreme Court held
> that the evidence was admissible to show common scheme or plan, *because
> it was evidence of the defendant's design to molest children.*"

*Id.* (emphasis added).

The trial court appears to have accepted the State's argument, explaining that it

would admit the testimony of W.N.'s mother and aunt because,

> [O]ftentimes the common scheme or plan, other acts are admitted as they
> are evidence of *a defendant's plan or design to molest children.* I find that
> that is the case in this particular instance. The plan doesn't have to be
> exactly the same. It has to be similar. *And the similarity doesn't have to be
> striking, according to the cases I've read.*

RP (Sept. 11, 2012) at 15 (emphasis added).

Mr. Slocum argues that the trial court was persuaded by the State to apply the

wrong legal standard. If the trial court believed that any evidence of a defendant's prior

molestation of a child was a sufficient basis for finding a "plan or design to molest

children" admissible under ER 404(b), then we agree. We reject the State's

characterization of *Gresham* to the trial court. *Gresham* did not modify the standard

established by earlier cases for determining whether prior acts were sufficiently similar to

be admissible as evidence of a defendant's criminal plan. All that it did—in the course of

determining whether the trial court in *Scherner* abused its discretion in finding a common

14

plan—was to discount some variations between the abuse of prior victims, reasoning that the variations could be discounted because there were other marked similarities in the abuse. It observed that "[w]ith respect to evidence of Scherner's abuse of [two victims], the implementation of the crime was markedly similar to the charged crime" and, with respect to the other two victims, while the crimes took place in a different location, "the remaining details share such a common occurrence of fact with the molestation of M.S. that we cannot say that the trial court abused its discretion in determining that these were merely individual manifestations of a common plan." 173 Wn.2d at 422-23.

Nowhere did the *Gresham* court suggest, as the State argued in the trial court, that variations in a defendant's molestation of earlier victims can be disregarded because the prior acts demonstrate a defendant's plan "to molest children." To construe that as a holding of *Gresham* is to conclude that, when it comes to child molestation cases, the Supreme Court no longer recognizes the categorical bar to propensity evidence expressed in ER 404(b).

The State's position on appeal is more tempered. It concedes that if the only common plan demonstrated was a plan to molest children then the admission of the evidence would have been improper. It argues, however, that there were other significant similarities, suggesting that the trial court did not rely on a general plan to molest children. Assuming arguendo that the trial court applied the correct legal standard, Mr. Slocum argues that the trial court's decision was manifestly unreasonable, given the facts

15

and the applicable legal standard. Considering the record, we again agree. Only the evidence of the recliner incident involving W.N.'s mother could be admitted consistent with a correct view of the law.

In arguing that there were sufficiently significant similarities to support a true plan devised by Mr. Slocum, the State overstates similarities between the prior acts and W.N.'s allegations. W.N. was much younger than her mother and aunt when the touching began and, unlike her mother's and aunt's complaints of isolated incidents of touching, she alleges molestation that was ongoing, over a period of years. The State argues conclusorily that Mr. Slocum stood in a similar position of authority to all three victims, but we find no testimony from any victim about Mr. Slocum's perceived authority. The evidence presented about the girls' relationship with Mr. Slocum was that W.N.'s mother never got along well with her stepfather;[2] that W.N. denied ever having a close relationship with her step-grandfather; and, when it came to W.N.'s aunt, that Mr. Slocum was only her brother's father-in-law. The evidence establishes only that in the case of all three victims, they were young, Mr. Slocum was an adult, and there was a family relation by marriage.

---

[2] Ms. Slocum testified that her daughter had been upset when Mr. Slocum initially became part of their household; that W.N.'s mother had been "at an age where having another man figure, a stepfather . . . wasn't exactly pleasing to her." RP (Sept. 12, 2012) at 75. She also testified that W.N. continued to have visitation with her natural father weekly or every other week. *Id.* at 76.

16

The argument by the State that the molestation always occurred when Mr. Slocum "could be assured privacy" and when "they were alone . . . and when his wife was out of the house" also overstates the record. Br. of Resp't at 7. While Ms. Slocum might not have constantly been in the same room with her husband, W.N.'s mother and Ms. Slocum both testified that W.N.'s mother asked Ms. Slocum never to leave W.N. alone with Mr. Slocum, and Ms. Slocum's testimony was that she never did. The only contrary testimony from W.N. was that there were instances when Mr. Slocum picked her up from softball and they were alone in his truck. And W.N.'s aunt testified that her brother and Ms. Slocum were just outside the Slocum home, at the pool, when Mr. Slocum offered to help her with the suntan lotion.

The facts of this case are therefore unlike cases where the defendant had a design for getting a victim physically isolated from possible witnesses. Mr. Slocum simply seized opportunities when no one was watching. The fact that a defendant molests victims when no one is close enough to see what is going on is too unlike a strategy for isolating a victim; it is not evidence of a plan.

We cannot say that the trial court abused its discretion in deciding that the incidents in which Mr. Slocum invited W.N. or her mother to sit with him in his recliner were individual manifestations of a common plan. Inviting the girls to sit next to him or in his lap would be a way for him to get them close enough to molest, in what would be perceived as grandfatherly behavior, and then to escalate to more sexual contact in a way

17

that the girls might feel uncomfortable challenging and that Ms. Slocum, if otherwise occupied, would not notice. In both cases, Mr. Slocum is accused of rubbing the girls' crotch and vaginal areas. It was not manifestly unreasonable for the trial court to admit W.N.'s mother's testimony about being molested in the recliner. The trial court did not abuse its discretion in concluding that the evidence was more probative than prejudicial.[3]

There is no evidence to suggest that the incidents in which Mr. Slocum was on the floor with W.N.'s mother or putting sunscreen on W.N.'s aunt were anything but opportunistic, however. Admission of that evidence was manifestly unreasonable whether or not the trial court had the correct legal standard in mind.

If the State views this as an unreasoned distinction, we remind it that the question to be answered in applying ER 404(b) is not whether a defendant's prior bad acts are logically relevant—they are. Evidence that a criminal defendant is a "criminal type" is relevant. But ER 404(b) reflects the long-standing policy of Anglo-American law to exclude most character evidence because "it is said to weigh too much with the jury and to so overpersuade them . . . . The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to

---

[3] "Generally, courts will find that probative value is substantial in cases where there is very little proof that sexual abuse has occurred, particularly where the only other evidence is the testimony of the child victim." *State v. Sexsmith*, 138 Wn. App. 497, 506, 157 P.3d 901 (2007).

prevent confusion of issues, unfair surprise and undue prejudice." *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 93 L. Ed. 168 (1948).

The question to be answered in applying ER 404(b) is whether the bad acts are relevant for a purpose other than showing propensity. Unlike prior opportunistic crimes, which are relevant to show propensity but inadmissible because of the policy reflected in ER 404(b), evidence that a charged crime was carried out in a manner devised by the defendant and used by him more than once has a distinct and additional probative value that justifies its admission.

Because the trial court applied the wrong legal standard or made a manifestly unreasonable ruling in admitting two of the prior acts of molestation, Mr. Slocum's judgment and sentence must be reversed unless the error was harmless. Under the applicable nonconstitutional harmless error test, the question is whether within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. *Gresham*, 173 Wn.2d at 433.

W.N. was not impaired during any of the incidents of sexual molestation as was the victim in *Lough*; she testified clearly; she offered explanations for inconsistencies and errors in her statements to the police and others; and Mr. Slocum's theory of her motive in advancing the allegations was not strong. On the other hand, she admitted that she had been taught at school and in home about reporting inappropriate touching; she changed and enlarged upon her allegations; and she provided a date for one incident for which Mr.

19

Slocum had an alibi. Mr. Slocum presented evidence of his long-standing impotence and the testimony of his ex-wife who, despite having divorced Mr. Slocum over W.N.'s allegations, testified that she had accepted his explanation and denial of misconduct in 1981, that she had never left W.N. alone with her husband, and that she had never seen him touch her daughter or granddaughter inappropriately.

Given this conflicting evidence, we cannot say that the admission of prejudicial evidence of the two opportunistic acts of molestation—evidence that would have bolstered W.N.'s credibility and at the same time detracted from Mr. Slocum's—did not materially affect the trial within reasonable probabilities. In this case, as in *Gresham* and more recently in *State v. Gower*, one cannot conclude that "highly prejudicial evidence of prior sex offenses" was harmless. 179 Wn.2d 851, 858, 321 P.3d 1178 (2014). A new trial is required.

## II. Additional assignments of error

Given our decision that a new trial is required, little need be said about Mr. Slocum's remaining assignments of error.

Mr. Slocum argues that his lawyer provided ineffective assistance of counsel when he failed to object to the testimony of a series of State witnesses with whom W.N. had spoken about the reported abuse. He characterizes the testimony of the witnesses as irrelevant, cumulative, attributing an aura of reliability to W.N.'s accusations, bolstering her testimony, and playing to the passions of the jury. Although the same grounds for

20

objection may arise on retrial, it is impossible to address either the merits of objections or the strategic considerations bearing on whether to make them until the testimony is presented. If the State presents the same evidence in the retrial, Mr. Slocum's lawyer will have a new opportunity to object.

He argues that the trial court erred in refusing to allow him to offer the recorded statement he made to police officers, denying any inappropriate touching of W.N., as a prior consistent statement. Prior consistent statements are never admissible to reinforce or bolster testimony. *State v. Purdom*, 106 Wn.2d 745, 750, 725 P.2d 622 (1986). They are admissible, among other reasons, to rebut an express or implied charge of recent fabrication. ER 801(d)(1)(ii).

Mr. Slocum contends that because he withdrew a guilty plea, the State expressly or impliedly charged that in protesting his innocence at trial, Mr. Slocum was not telling the truth. From our review of the record, it appears that the jury never heard about the withdrawn guilty plea or a suggestion that Mr. Slocum ever did anything but proclaim his innocence. If the jury is presented in the retrial with evidence or argument that Mr. Slocum's claim of innocence is a recent fabrication, his lawyer will have an opportunity to offer Mr. Slocum's recorded statement under ER 801(d)(l)(ii).

Our reversal of the judgment and sentence renders moot Mr. Slocum's assignments of error to its legal financial obligation provisions. Mr. Slocum filed a statement of additional grounds but it does not inform us of the nature and occurrence of

21

No. 31237-2-III
*State v. Slocum*

any alleged error in a manner sufficient for effective review. We decline to consider it.

RAP 10.10(c).

We reverse and remand for proceedings consistent with this opinion.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Antosz, J.P.T.