**FILED**
**MAY 20, 2021**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37260-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ROBERT M. WAGGY, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Robert Waggy appeals his conviction for third degree assault. We affirm the conviction but remand with instructions to strike supervision fees from the judgment and sentence.

BACKGROUND

For over 13 years the Waggys and Bewicks lived next door to each other in houses separated by an uncomfortably narrow strip of land. The two families never enjoyed a good relationship. They bickered over issues such as Robert Waggy's wandering chickens and his snow removal practices. Things became especially sour when Christian Bewick

constructed an exterior entrance to his rear basement and an adjoining walkway. Mr.

Waggy claimed the stairs to the entrance and portions of the walkway encroached on his

property. Reproduced below is a photo of the walkway constructed by Mr. Bewick.

The Bewick house is on the left; the Waggy house in on the right.



Ex. P-11.

Mr. Waggy never obtained a survey to verify his property line concerns.

Nevertheless, in 2017, Mr. Waggy sent the Bewicks a notice of trespass letter, claiming

the Bewicks' basement stairs and walkway impinged on his property. Mr. Waggy

informed the Bewicks he would charge them $5,000 per day unless they removed the

walkway and stairs from his property and ceased all other forms of trespass. A copy of

the letter is reproduced below.

12-17-2017

Chris and Stacy Bewick,

This letter is to inform you that your construction of the walkway and stairs going to your basement is on my property and not authorized. Please remove the sections that are on my property and return the ground to its original state; with dirt and grass.

The No Trespassing sign on my porch clearly states that there is a $5000.00 per use, per day fee for being on my property, therefore I will give you 14 days to remove your construction from my property. Effective January 1st, 2018 I will begin charging you this fee.

Also please do not trespass on my property if you go around your house to use your basement door. If you, or any of your visitors do, I will assess the usage fee and file criminal trespass charges.

Thank You,
Robert Waggy

Ex. P-14. Mr. Bewick attempted to resolve the property dispute with Mr. Waggy to no avail.

Mr. Waggy sent a second letter to the Bewicks in the spring of 2018. Although Mr. Waggy had never gone to court on the trespass issue, he claimed the Bewicks owed him a half million dollars for violating his property rights. A copy of the letter is reproduced below.

4-8-2018

Chris and Staci Bewick,

This is a follow up letter to the Dec. 17, 2017 letter I sent to you. You still have not removed the sidewalk you built on my property. As stated in the first letter there is a $5000.00 per day fee for the use of my property, as posted on the no trespassing sign at the front of my house. April 10th is 100 days since I had given you to remove the sidewalk and repair my property, therefore your bill to that date is $500,000.00. Please pay the debt you owe and repair my property ASAP. If you fail to do so I may hire someone to repair the damage myself and have you billed for the work. Please comply with the setback rule in the Spokane Municipal Code if you choose to do work that infringes on my property. You stated that you did not want to have litigate this matter, and neither do I, but you need to repair my property, follow the law and pay the fee that you have incurred.

Thank You for your attention.

Robert M. Waggy

Ex. P-15. The Bewicks ignored the letter.

On October 19, 2018, Mr. Waggy saw one of Mr. Bewick's friends using the walkway to access the Bewicks' basement. Mr. Waggy told the friend to stop, claiming he was intruding on Mr. Waggy's property. The friend and Mr. Waggy argued until Mr. Waggy threatened to call police and shouted out to his wife, "'Honey, get my weapon.'" 1 Report of Proceedings (RP) (Nov. 5, 2019) at 129-30. At this point, Mr. Bewick's friend stopped arguing and went inside Mr. Bewick's home, using the front door.

When Mr. Bewick heard what happened, he ran outside and engaged Mr. Waggy in a verbal argument. Mr. Bewick was not armed and did not threaten to harm Mr. Waggy. Mr. Bewick then returned to his house, talked to his wife, and asked her to record Mr. Waggy using her cell phone.

4

Mr. Waggy called 911 on his cell phone to report the alleged trespass on his property. As he did so, Mr. Bewick, his wife, and son exited their home. Ms. Bewick then started video recording Mr. Waggy. On the video, Mr. Waggy can be seen holding a can of pepper spray while talking on the phone. Mr. Bewick then went into his home, retrieved a box of property, and started leaving his basement through the side door. Mr. Bewick carried the box along the walkway between the Bewick and Waggy houses.

About 45 seconds into Ms. Bewick's video, Mr. Waggy can be seen walking toward the pathway, still holding the can of pepper spray and talking on the phone. He shows no visible signs of distress. At 45 seconds, Mr. Waggy began shaking the can of pepper spray. The next second, Ms. Bewick can be heard stating, "don't you dare." Ex. P-12. Mr. Waggy continued to approach the walkway.

At 47 seconds, Mr. Waggy deployed a visible stream of pepper spray in the direction of Mr. Bewick, who was still outside the frame of view. As Mr. Waggy started spraying, the Bewicks' son began swearing at Mr. Waggy. Mr. Waggy continued spraying Mr. Bewick over the next two seconds. Mr. Bewick then threw the box he was carrying at Mr. Waggy. The box landed in the Waggys' bushes. Ms. Bewick continued recording.

Over the next 20 seconds, the families yelled at each other, Mr. Waggy put the pepper spray back in his pocket and began picking up the box and its contents off his

5

bushes. At one minute, 24 seconds, the Bewicks' son could be heard offering to "go" with Mr. Waggy if he put down the pepper spray, and what sounded like a fist smacking another hand could be heard. Ex. P-12. Mr. Waggy stayed on the phone and appeared relatively calm throughout the recording.

Police arrived and wrestled Mr. Waggy to the ground. Mr. Waggy was arrested and charged with third degree assault for pepper spraying Mr. Bewick. Mr. Waggy admitted he purposefully pepper sprayed Mr. Bewick, but claimed he did so in self-defense.

Mr. Waggy's case proceeded to trial. Prior to jury selection, the State requested permission to cross-examine Mr. Waggy with his record for prior harassments and related behavior. The court reserved ruling.

After the State rested its case, Mr. Waggy took the stand and explained his version of the events. According to Mr. Waggy, he was a victim of the Bewicks' harassment and threats. Mr. Waggy testified he was a disabled veteran, suffering from posttraumatic stress disorder. Mr. Waggy explained his condition made him hypervigilant and protective of his family. Mr. Waggy claimed he was respectful during his interactions with the Bewicks, but they escalated matters. During his testimony, Mr. Waggy never referenced disputes with anyone other than the Bewicks. Mr. Waggy also never testified about his reputation or claimed to have a general peaceful disposition.

6

In discussing the incident leading up to his arrest, Mr. Waggy testified Mr. Bewick had threatened to kill him. He also claimed others from the Bewick household were engaged in threatening conduct. Immediately before deploying the pepper spray, Mr. Waggy testified he walked around to the side of his house to see what Mr. Bewick was doing. According to Mr. Waggy, Mr. Bewick then charged at him with a box. Mr. Waggy explained he used the pepper spray to defend himself from Mr. Bewick because he felt threatened and afraid.

After hearing from Mr. Waggy, the court ruled the prosecutor could cross-examine Mr. Waggy regarding his prior misconduct. According to the trial court, Mr. Waggy had placed his physical and mental health at issue. The court reasoned Mr. Waggy's prior legal troubles were relevant to his state of mind and intent. The court also ruled the probative value of Mr. Waggy's prior conduct outweighed any prejudicial effect.

The State cross-examined Mr. Waggy pursuant to the court's ruling. The State elicited testimony from Mr. Waggy that he had a history of attempting to collect large fines from others. Specifically, the prosecutor inquired into a property dispute between Mr. Waggy and the United States Department of Veterans Affairs (VA), wherein Mr. Waggy claimed he was owed over $9 million. The nature of the dispute was not explained. Mr. Waggy admitted he had been convicted of harassment against the VA

several times. Mr. Waggy also admitted that at one point he had called the VA and threatened to use force to defend himself. No details were elicited regarding this phone call or whether Mr. Waggy followed up on his threat.

In addition to his testimony about the VA, Mr. Waggy agreed he did not trust law enforcement and had been involved with prior altercations or standoffs with the police. The prosecutor asked Mr. Waggy about his military training and Mr. Waggy admitted he was trained to engage a threat, not to retreat.

During the State's cross-examination, Mr. Waggy expressed confusion over how his interactions with the VA and law enforcement were relevant to the offense for which he was currently being tried. The prosecutor then engaged Mr. Waggy in the following colloquy:

> Q  During your direct testimony, you talked a lot about how [Ms.] Bewick had harassed you, correct?
> A  It was—
> Q  I believe your statement was—
> A  About the snow and about the chicken, always getting irritated about stuff, yes.
> Q  I believe your testimony was for 10 years we've been putting up with [Ms. Bewick's] harassment when you were talking to [Mr. Bewick].
> A  Okay.
> Q  But you're the one with harassment history, aren't you?
> A  With the government, correct.
> . . . .

Q . . . Mr. Waggy, you have a history of requesting fines, asking for repairs, and then demanding to use self-defense to regain your property or what is owed to you, right?
A No. That's not what happened.

2 RP (Nov. 6, 2019) at 443-45.

The jury found Mr. Waggy guilty. Mr. Waggy timely appeals.

ANALYSIS

*Admission of evidence of prior bad acts*

Mr. Waggy contends the trial court improperly allowed the prosecutor to cross-examine him regarding prior bad acts in violation of ER 404(b). The State answers the court appropriately admitted Mr. Waggy's prior bad acts to rebut his testimony about his health, peacefulness, motive, knowledge, and intent when he pepper sprayed Mr. Bewick. The State also claims that if the court violated ER 404(b), the error was harmless. We agree with Mr. Waggy that the prior bad acts were inadmissible under ER 404(b), but we also agree with the State that this evidentiary error was harmless.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). Nevertheless, prior acts may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. "The question to be answered in applying ER 404(b) is whether the bad acts are relevant

9

for a purpose other than showing propensity." *State v. Slocum*, 183 Wn. App. 438, 456, 333 P.3d 541 (2014). We review the trial court's ER 404(b) decision for abuse of discretion. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

The State and the trial court appear to have identified three nonpropensity purposes of admitting bad act evidence against Mr. Waggy: First, the evidence was part of the res gestae of the current offense; second, the evidence rebutted Mr. Waggy's testimony regarding his mental state; and third, the evidence was relevant to show a common plan or scheme of misconduct. We do not find any of these three purposes relevant to Mr. Waggy's case.

Res gestae was inapplicable to the State's prior act evidence. Res gestae refers to evidence of the same transaction as the one on trial. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). Res gestae evidence is admissible even if it encompasses uncharged bad acts because it is necessary to place a defendant's actions in their immediate context. *Id*. Here, there was no immediate relationship between Mr. Waggy's assault of Mr. Bewick and his prior disputes with the VA and law enforcement. The evidence did not place Mr. Waggy's assault in context or qualify as res gestae.

The State's prior act evidence also did not rebut Mr. Waggy's claim he felt threatened on the day of the assault. Prior interactions with Mr. Bewick or members of the

Bewick household might have been pertinent to Mr. Waggy's claim that he was afraid of

Mr. Bewick.[1] It is also conceivable that details of Mr. Waggy's prior confrontation with

the VA or law enforcement could have shed light on how he acts when he is afraid, as

opposed to when he is being an aggressor. But the other act evidence at issue in this

appeal did not pertain to Mr. Waggy's interactions with the Bewicks. And the evidence of

Mr. Waggy's prior interactions with the VA and law enforcement were too vague to shed

light on how he acts when afraid or engaged in aggression.

Finally, the concept of proving a common plan or scheme was not relevant to the

offense on trial. Common plan or scheme evidence is not per se admissible. If it were,

ER 404(b)'s exclusion of character evidence would be turned on its head. *See United*

*States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir. 1987). To be admissible, common plan

or scheme evidence must show something distinct from the defendant's bad character.

*State v. Lough*, 125 Wn.2d 847, 860, 889 P.2d 487 (1995). For example, a prior pattern

of misconduct might show identity, intent, or absence of mistake. *See Beasley*, 809 F.2d

at 1278.

---

[1] Indeed, the court admitted extensive evidence about Mr. Waggy's interactions with the Bewicks without objection.

Here, there was no noncharacter purpose for the State's common plan or scheme evidence. Identity was not at issue and Mr. Waggy admitted he intended to assault Mr. Bewick. He merely claimed self-defense. The State suggests Mr. Waggy's prior conduct was relevant to show an overarching plan, but that is simply not true. The cursory evidence about Mr. Waggy's prior offenses failed to show Mr. Waggy's assault of Mr. Bewick was part of a grand scheme to defraud others and then claim self-defense. The State only elicited one sentence from Mr. Waggy regarding a prior defense issue. Mr. Waggy admitted that he once called the VA and threatened to defend himself. It is unclear why Mr. Waggy made this threat or whether it was related to his harassment convictions. There is no indication Mr. Waggy ever followed up on the threat. Rather than show an overarching criminal plan, the State's questioning of Mr. Waggy reveals the intent of eliciting prior act evidence was to depict Mr. Waggy as the type of person who concocted false claims against others. This was bad character evidence. It should not have been admitted.

The State suggests Mr. Waggy put his character at issue during his testimony and therefore opened the door to otherwise inadmissible bad character evidence. There are two problems with this argument. First, Mr. Waggy never claimed he was generally a peaceful person. His claims to peaceful behavior were specific to his interactions

12

with the Bewicks. Second, character can only be presented through reputation testimony. ER 405(a). Mr. Waggy never presented any reputation testimony. Had the prosecutor believed Mr. Waggy was introducing character evidence in a manner contrary to ER 405(a), it was obliged to object. *See State v. Rushworth*, 12 Wn. App. 2d 466, 476, 458 P.3d 1192 (2020). It was not appropriate for the State to sit on an evidentiary objection in order to "'seize[ ] the opportunity to admit otherwise clearly inadmissible' evidence . . . ." *Id.* (alteration in original) (quoting *State v. Jones*, 144 Wn. App. 284, 295, 183 P.3d 307 (2008)).

The trial court's decision to allow cross-examination of Mr. Waggy on prior acts violated ER 404(b). Because this was an evidentiary error, prejudice is governed by the nonconstitutional harmless error analysis. *See State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). This standard requires Mr. Waggy to show a reasonable probability that the trial court's error affected the outcome of his case. *Id.*

Mr. Waggy has not met his burden of showing prejudice. The assault of Mr. Bewick was recorded and admitted into evidence. The recording discredits Mr. Waggy's testimony that he was acting in self-defense. The recording shows Mr. Waggy advanced on Mr. Bewick while armed with pepper spray. Mr. Waggy began shaking the can of pepper spray before he rounded the corner of his home to face Mr. Bewick. Mr. Waggy

13

was on the phone with 911 the entire time of the assault and showed little change in facial expression. Mr. Bewick's family did not begin verbally threatening Mr. Waggy until after Mr. Waggy pepper sprayed Mr. Bewick. In light of the video recording, it is highly unlikely any juror would have found Mr. Waggy reasonably believed himself to be in imminent danger.

The evidence of Mr. Waggy's disputes with the VA and law enforcement undoubtedly cast Mr. Waggy in a negative light. But this information was cumulative of other evidence. The letters written by Mr. Waggy to the Bewicks reveal Mr. Waggy had an unrealistic sense of his authority over others and was prone to exaggeration. The letters were part of the res gestae of the case and already painted Mr. Waggy in a negative light. The State's additional bad act evidence did not appreciably cause more harm.

The State's prior bad act evidence was inappropriate and unnecessary. However, Mr. Waggy has not shown it impacted the final result of his trial.

*Community custody conditions*

Mr. Waggy contends the trial court improperly imposed three types of conditions in his sentence: (1) supervision fees, (2) a prohibition on the consumption or possession of alcohol or controlled substances, and (3) conditions designated as "per CCO

14

[community corrections officer]." Clerk's Papers (CP) at 241. The State concedes the first issue, but not the second and third. We agree with the State.

### Supervision fees

Supervision fees are governed by RCW 9.94A.703(2). This statute provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . [p]ay supervision fees as determined by the [Department of Corrections]." RCW 9.94A.703(2)(d). Given supervision fees are waivable, they are discretionary. However, they are not a "cost" under RCW 10.01.160(3) that "shall not" be imposed on an indigent defendant. *See State v. Spaulding*, 15 Wn. App. 2d 526, 536, 476 P.3d 205 (2020).

The parties agree the trial court intended to waive all discretionary legal financial obligations. Yet the court failed to strike boilerplate language, buried in the judgment and sentence form, imposing discretionary supervision fees. Given the parties' agreement regarding the trial court's intent, we deem the court's failure to strike the supervision fees to be a clerical error. The trial court is directed to remedy this error on remand.

### Alcohol & controlled substance provisions

Community custody conditions are governed by RCW 9.94A.703. Under this statute, drug and alcohol prohibitions are available in all criminal cases, regardless of

individual circumstances. Subsection (2)(c) of the statute provides that a drug prohibition

condition is mandatory in all cases unless waived. Subsection (3)(e) provides that an

alcohol prohibition condition is discretionary in all cases. Given the broad statutory

authorization set forth in RCW 9.94A.703, the trial court did not err in imposing drug and

alcohol prohibitions against Mr. Waggy.

### Conditions "per CCO"

Mr. Waggy's judgment and sentence form includes a series of community custody

conditions. The last condition is listed as follows:

✓ Other conditions: _____ per CCO _____

_____

CP at 241.

Mr. Waggy complains this final condition improperly delegates the trial court's

sentencing authority to the Department of Corrections. We disagree. The court's order

that Mr. Waggy will comply with conditions "per CCO" merely reflects the statutory

requirement that a person subject to community custody be required "to comply with

any conditions imposed by the [Department of Corrections] under RCW 9.94A.704."

RCW 9.94A.703(1)(b). This is a proper exercise of judicial authority. *State v.*

*McWilliams*, 177 Wn. App. 139, 152-54, 311 P.3d 584 (2013).

16

No. 37260-0-III
*State v. Waggy*

CONCLUSION

Mr. Waggy's conviction is affirmed. This matter is remanded for the limited

purpose of striking imposition of supervision fees from the judgment and sentence.

The sentence is otherwise affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Lawrence-Berrey, J.

17