IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38751-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARWAN ABDULLAH NASSIR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Marwan Nassir[1] appeals convictions for second degree assault

(strangulation) and interfering with the reporting of domestic violence. The State

concedes that the admission of ER 404(b) evidence of a prior assault by Mr. Nassir was

reversible error. We agree, reverse the convictions, and remand for a new trial.

FACTS AND PROCEDURAL BACKGROUND

Marwan Nassir and Silviya Chernenko are former domestic partners and the

parents of twin daughters. Although their relationship was tumultuous and punctuated by

breakups and alleged instances of verbal and physical abuse by Mr. Nassir, they were

---

[1] We use the spelling of the defendant's last name supported by the criminal rules, but note that a number of filings in the trial court, including the information and evidence of a federal conviction, spell the defendant's last name "Nasser." "Nasser" is also how he personally spelled it for the record when called as a witness. *See* Rep. of Proc. at 527.

living together with their then almost five-year-old daughters in November 2021, when the events leading to Mr. Nassir's prosecution in this matter occurred.

On November 1, the couple had the first of two arguments that would lead to the criminal trial below. Mr. Nassir would later testify that November 1 was an unremarkable day. He claims to have awakened and, while Ms. Chernenko slept, he got the children ready and took them to school. He then returned home, switched cars, and went to work. When he arrived home in the evening, the family had dinner and watched TV. After Ms. Chernenko and the girls went to bed, Mr. Nassir stayed up until about midnight, using his laptop. Late in the evening, he accessed a shared storage drive where members of the family could access photographs and messages and where, according to Mr. Nassir, he and Ms. Chernenko commonly read each other's messages. He saw that Ms. Chernenko had texted an unsaved contact who appeared to be a therapist or psychologist. He was offended by the content of the messages, which apparently referred to him as a "sperm donor" and an "idiot" who did not make enough money. Rep. of Proc. (RP) at 539.[2]

Ms. Chernenko has a different version of the events of the day. She agrees that Mr. Nassir took the girls to school but contends he began the morning by fighting with her, apparently upset about the fact that she had disclosed their relationship problems to

---

[2] References to the report of proceedings are to the verbatim report that includes pretrial hearings, the trial, and sentencing.

her psychologist via text message. Because his normal practice after taking the girls to school was to return the car and immediately leave for work, she was apprehensive when she heard him come into the house on his return, and locked her bedroom door. According to her, Mr. Nassir forced himself into her room, grabbed her arms and twisted them behind her back, threw her on the bed, and put his knee against her back. He also pushed her against the walls. She would later allege that he attempted to rape her that morning, but she fended him off by threatening to make a police report. Ms. Chernenko did not call the police that day, but did speak with a victim advocate at the YMCA.

Mr. Nassir's version of events was that it was not November 1, but the morning of November 2 that he and Ms. Chernenko fought about the text messages he viewed the night before. He acknowledges he was also angry that Ms. Chernenko insisted on taking the children to school. Mr. Nassir contends they argued as she prepared to leave, but he never left the interior of the house because he did not want his neighbors to see him undressed and angry.

Ms. Chernenko's version of events is that Mr. Nassir woke up later than usual on November 2, which was why she had already put her daughters in the car and was preparing to take them to school. According to her, that morning's fight was because Mr. Nassir wanted to be the one to take the girls to school, as was his routine. A shouting match ensued. Ms. Chernenko testified that Mr. Nassir tried to prevent her from leaving

by attempting to open the car door as she backed out, following the car out of the garage and down the driveway.

The parties' accounts diverge again about what occurred after Ms. Chernenko returned from the school and found Mr. Nassir waiting for her. According to Ms. Chernenko, Mr. Nassir followed her up the stairs, verbally harassing her. He followed her through her bedroom and into her bathroom, where he began strangling her, releasing her, and strangling her again, telling her one minute that he loved her and the next that he would kill her. She claims she was pushing him away and threatening to call the police, and was able to get past him and head for her car. Once again, he attempted to prevent her from leaving, closing the garage door after she had opened it, and reaching into her car to attempt to put it in park. Mr. Nassir denied the assault but agreed that he continued to argue with Ms. Chernenko from the time she returned home until she left again.

The parties agree that after Ms. Chernenko entered her car and was arguing with Mr. Nassir, who was standing outside, she attempted to dial 911 and Mr. Nassir grabbed her phone and cancelled the call. Mr. Nassir claims Ms. Chernenko often threatened to contact law enforcement in response to their arguments.

On leaving, Ms. Chernenko drove to the Spokane police station, which is located in the Public Safety Building. Undecided about what to do next, she sat inside her car in the parking lot for about 15 minutes. She then decided to text a friend and former coworker who was a former deputy sheriff. They talked briefly on the phone and agreed

4

to meet at a nearby Starbucks, where Ms. Chernenko told him about Mr. Nassir

strangling her that morning.

Her friend's wife was a family law attorney, and he took Ms. Chernenko to speak

with her, since Ms. Chernenko wished to speak with her about how to separate from Mr.

Nassir and obtain custody of her daughters.  After speaking with her friend's wife, Ms.

Chernenko agreed to report the assault to police.  Officers at the Public Safety Building

interviewed Ms. Chernenko for approximately three hours.  Photographs were taken of

what she identified as injuries from the assault.

Shortly after Ms. Chernenko and her friend emerged from the Public Safety

Building, Mr. Nassir called Ms. Chernenko, angry, having learned of her report to police

through his probation officer.[3]  He was arrested that afternoon and was thereafter charged

with second degree assault, fourth degree assault, and interfering with the reporting of

domestic violence.

In pretrial motions in limine, the State sought a ruling that it could offer evidence

of prior incidents between Mr. Nassir and Ms. Chernenko in which he had been either

violent or controlling.  It cited as support for evidence of controlling behavior *State v.

Grant*, 83 Wn. App. 98, 920 P.2d 609 (1996), citing the court's statements that the

evidence was admissible "'at the very least for the purposes [sic] . . . of explaining Ms.

---

[3] Mr. Nassir was on federal probation following his entry of a guilty plea to three counts of bank fraud.

Grant's inconsistent statements and conduct,'" given how "'[v]ictims of domestic violence often attempt to placate their abusers,'" and "'minimize the degree of violence when discussing it with others.'"  Clerk's Papers (CP) at 52 (quoting *Grant*, 83 Wn. App. at 107).  It also argued that the evidence was admissible to prove motive, intent, and lack of mistake or accident.

At a hearing on the State's motion, the prosecutor questioned Ms. Chernenko about the evidence he wished to present, including, as relevant to this appeal, an assault that Mr. Nassir committed in 2016.  Ms. Chernenko testified that it occurred on Father's Day 2016, when Ms. Chernenko had something planned, but Mr. Nassir wanted to do something else.  They argued.  Each was holding one of their then-18-month-old daughters.  Ms. Chernenko testified that as the argument escalated, Mr. Nassir threw the daughter in his arms to the floor, ran after Ms. Chernenko, and punched and hit her in the face.  He then wrested the other daughter from Ms. Chernenko's arms, said it was the last time Ms. Chernenko would see her, and ran with his daughter to the car.  Ms. Chernenko picked her other daughter up from the floor and phoned the police, who responded to her home and photographed her injuries.

Following Ms. Chernenko's testimony, the prosecutor repeated the argument from his briefing that evidence of Mr. Nassir's prior acts of controlling behavior and violence were probative in the current case of motive, intent, lack of mistake, or accident.

6

Defense counsel responded, "I'm not going to argue to the jury that this was a mistake. I'm not going to argue to the jury he didn't have motivation. . . . I'm arguing denial, innocence." RP at 73. Addressing the issue of opportunity, defense counsel argued, "We're not going to deny that they lived together. We're not going to lie—deny that they had a volatile relationship. That's all going to come out." RP at 74. Defense counsel also argued that the evidence of controlling behavior appeared unrelated to any need to explain Ms. Chernenko's behavior because the State had identified its witnesses, and it had not identified any expert on battered woman's syndrome.

The trial court ruled that it would not admit evidence of an incident that happened in 2013 or what it characterized as "scattershot" evidence of behaviors that Ms. Chernenko described as "happening all the time." RP at 83. But it ruled the State could present evidence of the assault on Father's Day 2016. It provided the following explanation for admitting evidence of the 2016 assault:

> It's clear to me that . . . the event did occur. It's clear that that does link to . . . if not inten[t]ion, certainly the lack of mistake or accident and *knowledge that this person knows of a propensity to be that violent and that hot headed*. I think that there is evidence that that evidence is relevant to the crime[ ] of 2nd Degree Assault on November the 2nd[, a]s well as the potential for interfering with the reporting of domestic violence. And, in that circumstance, I find that the probative value of that experience does outweigh the prejudicial effect of the jury being advised.

RP at 86-87 (emphasis added). The court later instructed the jury that testimony about prior acts by the defendant was offered for a limited purpose and "may be considered by

7

you only to the extent you find it relevant to issues of motive, opportunity, intent, preparation, plan, knowledge or absence of mistake or accident." CP at 63.

Both Ms. Chernenko and Mr. Nassir were questioned during the trial about the 2016 assault. Defense counsel's questions to Ms. Chernenko and witnesses who supported her sought to portray them as unreliable narrators who lacked physical evidence of any assault. The defense theory was that Ms. Chernenko was using the criminal process to obtain full custody of the children.

During closing argument, the prosecutor had the following to say about evidence of the 2016 assault:

> One of the things the State has to prove is intent. Did he intentionally strangle? Yes, he did. The squeeze and release proves that, and so does his behavior in 2016. *It shows his propensity to get violent.* It wasn't an accident[,] it was intentional.

RP at 646 (emphasis added).[4] Mr. Nassir's attorney did not object.

The jury found Mr. Nassir guilty of the crimes alleged to have occurred on November 2 (the second degree assault and intentionally interfering with reporting of domestic violence), but acquitted him of the fourth degree assault he was alleged to have committed on November 1. The court sentenced him to 84 months of confinement followed by a term of 18 months of community custody. Mr. Nassir appeals.

---

[4] The transcript records the court as making this statement, but as the parties agree, it is clear from context that this was argument by the prosecutor.

ANALYSIS

Mr. Nassir assigns error to the trial court's admission of evidence of his 2016 assault and to the prosecutor's argument in closing that the assault proved his "propensity to get violent," which Mr. Nassir contends was prosecutorial misconduct. The State concedes the evidence was improperly admitted, the prosecutor erred in arguing to the jury that it proved a propensity for violence, and the errors, within reasonable probabilities, materially affected the outcome of trial. For the following reasons, we agree.

ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. The same evidence may be admissible for other purposes, depending on its relevance and the balancing of the probative value and danger of unfair prejudice. *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). ER 404(b) includes a nonexclusive list of permissible purposes for admitting evidence of a person's other bad acts. Among the permitted uses is as proof of intent and the absence of mistake or accident, the purposes identified by the court in ruling that evidence of the 2016 assault would be admitted.

"[T]he question to be answered in applying ER 404(b) is not whether a defendant's prior bad acts are logically relevant—they are. Evidence that a criminal defendant is a 'criminal type' is relevant. But ER 404(b)

9

> reflects the long-standing policy of Anglo-American law to exclude most
> character evidence because "it is said to weigh too much with the jury and
> to so overpersuade them . . . . The overriding policy of excluding such
> evidence, despite its admitted probative value, is the practical experience
> that its disallowance tends to prevent confusion of issues, unfair surprise
> and undue prejudice."

*State v. Slocum*, 183 Wn. App. 438, 456, 333 P.3d 541 (2014) (quoting *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 93 L. Ed. 168 (1948)). Accordingly, "The question to be answered in applying ER 404(b) is whether the bad acts are relevant for a purpose *other than* showing propensity." *Id.* (emphasis added).

Before admitting evidence of a defendant's prior crime or wrong, the trial court "must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value [of the evidence] against the prejudicial effect." *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). "In doubtful cases, the evidence should be excluded." *Id.* If the evidence is admitted, the court must give a limiting instruction. *State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014). We review the trial court's decision to admit the evidence for abuse of discretion. *Vy Thang*, 145 Wn.2d at 642.

In this case, the purpose identified by the trial court for admitting evidence of the 2016 assault was intent, or if not, "certainly the lack of mistake or accident." RP at 86.

10

But as defense counsel pointed out to the court, Mr. Nassir would not be arguing or implying that he accidentally or mistakenly committed an act of strangulation. Even if the State had a plausible concern that the jury might perceive mistake, accident, or unintentional conduct as a defense, the only respect in which the 2016 assault would be relevant and probative would be the forbidden respect: as propensity evidence. Admitting it as evidence of "a propensity to be that violent and that hot headed" was the purpose foreclosed by the rule and was a clear abuse of discretion.

In arguing its motion for leave to offer the evidence, the State also emphasized Washington cases that have recognized a valid "victim credibility" purpose for ER 404(b) evidence in some domestic violence cases. Washington cases hold that in a domestic violence case where a victim made statements or engaged in conduct inconsistent with her (or his) claim of assault, it may be necessary for the court to admit evidence of a defendant's prior violence so the jury can "'evaluate [the victim's] credibility with full knowledge of the dynamics of a relationship marked by domestic violence and the effect such a relationship has on the victim.'" *Gunderson*, 181 Wn.2d at 928 (internal quotation marks omitted) (alteration in original) (Madsen, C.J., dissenting) (quoting *State v. Magers*, 164 Wn.2d 174, 186, 189 P.3d 126 (2008) (plurality opinion) (evidence of the defendant's prior violence was admissible to prove both that the victim's fear of bodily injury was objectively reasonable and as bearing on the credibility of her recantation)).

11

Our Supreme Court has cautioned, however, that the need to demonstrate the

dynamic of the victim-defendant relationship when the victim recants or makes

statements exculpating the defendant is not present when the victim makes no

inconsistent statements.  In *Gunderson*, the court agreed that the trial court abused its

discretion by admitting evidence of Gunderson's prior domestic violence against his ex-

girlfriend, Christina, where she had not made inconsistent statements about the matters

with which he was charged:

> The State concedes that Christina's testimony was internally
> consistent but argues that the trial court's admission of Gunderson's prior
> bad acts was nonetheless proper because other evidence contradicted
> Christina's account.  We decline to extend *Magers* to apply in such
> circumstances.  That other evidence from a different source contradicted the
> witness's testimony does not, by itself, make the history of domestic
> violence especially probative of the witness's credibility.  There are a
> variety of reasons why one witness's testimony may deviate from the other
> evidence in a given case.  In other words, the mere fact that a witness has
> been the victim of domestic violence does not relieve the State of the
> burden of establishing why or how the witness's testimony is unreliable.
>     Much like in cases involving sexual crimes, courts must be careful
> and methodical in weighing the probative value against the prejudicial
> effect of prior acts in domestic violence cases because the risk of unfair
> prejudice is very high.  To guard against this heightened prejudicial effect,
> we confine the admissibility of prior acts of domestic violence to cases
> where the State has established their overriding probative value, such as to
> explain a witness's otherwise inexplicable recantation or conflicting
> account of events.  *See Magers*, 164 Wn.2d at 186.  Otherwise, the jury
> may well put too great a weight on a past conviction and use the evidence
> for an improper purpose.

181 Wn.2d at 924-25 (footnote and citation omitted).  Like in *Gunderson*, Ms. Chernenko

did not make inconsistent statements.  She consistently accused Mr. Nassir of assault by

12

strangulation: to her friend, the former deputy sheriff; to his wife; to the police officers at the Public Safety Building; at the pretrial hearings; and during trial.

Error in admitting ER 404(b) evidence is subject to harmless error analysis, which asks whether "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Id.* at 926 (internal quotation marks omitted) (quoting *Gresham*, 173 Wn.2d at 433). In this case, not only do we begin with the "heightened prejudicial effect" of ER 404(b) evidence in a domestic violence case, but the jury began its deliberations with improper, unobjected-to encouragement by the prosecutor to consider the 2016 assault as "show[ing Mr. Nassir's] propensity to get violent." RP at 646.

The State's evidence was not particularly strong. As Mr. Nassir points out on appeal, "the physical symptoms of assault were attested to more by Ms. Chernenko's testimony than [by] the photos taken by the Sheriff's Office." Appellant's Am. Opening Br. at 53. We know from the jury's acquittal of Mr. Nassir on one count and its questions during deliberations that jurors had some reservations about the State's case.[5] Given all,

---

[5] During the course of their deliberations, the jury had several questions for the court, one being, "What do we do if we don't agree? If we cannot come to a unanimous verdict," and another being, "Can the 2nd degree assault charge be lowered or is it locked in as a 2nd degree charge?" CP at 84-85. (To the first question, the court responded, "Please review your jury instructions and continue in deliberations"; to the second, it responded, "The charges contained in the Court's instructions are the charges you should consider." *Id.*).

13

we are satisfied that within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.

Because the evidentiary error requires reversal of the convictions,[6] we need not engage in the analysis of whether, had a timely objection been made to the prosecutor's challenged statement during closing argument, any resulting prejudice could have been cured.

We reverse the judgment of conviction and remand for proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

---

[6] As pointed out by the State, it was an essential element of the interfering with the reporting of a domestic violence offense charge that the State prove the second degree assault. *See* CP at 76.

14