IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>          v.<br><br>ANTHONY PRESSLEY,<br><br>                    Appellant. | No. 83154-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A jury convicted Anthony Pressley of witness tampering and two violations of a protection order, as well as three counts of second-degree rape of a child, third degree rape of a child, and one count of second-degree child molestation with a special verdict finding a pattern of sexual abuse. He received an exceptional sentence based on the special verdict. He now appeals the conviction. He challenges the admission of evidence under ER 404(b) and the sufficiency of evidence for each alternative means for the charge of witness tampering. Pressley also argues the trial court erred by imposing an exceptional sentence without entering the requisite findings of fact and conclusions of law, and by imposing community custody conditions that violate his constitutional rights.

We affirm the convictions, as any error in admitting ER 404(b) evidence was harmless and because there was sufficient evidence of both alternative means of witness tampering. However, because the record contains no findings of fact and conclusions of law to support the exceptional sentence, we remand

for entry of the required findings and conclusions. We also remand to strike the challenged conditions because the condition restricting dating and other relationships is unconstitutionally vague and the condition restricting internet usage is not crime-related.

FACTS

Anthony Pressley and K.L. are half-siblings, 19 years apart, who share mother Andrea Green. Pressley and K.L. had a close relationship, spending time going for drives and listening to music together. After Pressley and his girlfriend broke up, he moved into a duplex and K.L. would visit often, sometimes spending the night. K.L. considered Pressley her best friend.

On February 7, 2019, 12-year-old K.L. went to Seattle Children's Hospital for a urology appointment for her recurrent urinary tract infections. Green had to work and could not attend, so 31-year-old Pressley drove K.L. and stayed in the waiting area. During the appointment, the nurse practitioner inquired whether K.L. was sexually active and mistakenly told K.L. that her answers were confidential. K.L. told the nurse practitioner and a social worker that she was sexually active with a male and they used condoms, but would not reveal any further information including name or age. The medical providers contacted law enforcement and Green to report the sexual activity.

When Green returned home from work that evening she confronted K.L. and asked with whom she was sexually active. Green eventually learned that

2

Pressley was having sex with K.L.[1] Green called 911 that night and an officer came out the next day to speak with them.

A few days later, Green filed a petition for an order of protection restraining Pressley from contact with K.L. The court granted the temporary order on February 13, 2019, and the order for protection on February 27, 2019. The order had an expiration date of February 26, 2020.

The State initially charged Pressley with one count of second-degree rape of a child in May 2020. On June 3, 2020, the court entered a sexual assault protection order prohibiting Pressley from having contact with K.L., which remained in effect until June 3, 2022.

In March 2021, Shelby Nguyen, Pressley's and K.L.'s half-sister, learned that the two had been in contact despite the protection order in place.[2] K.L. told the detective that she and Pressley had been talking on the phone since April 2020, and had met in person one time and had sex in Pressley's car.

After the detective learned of the ongoing contact between K.L. and Pressley, the State filed amended charges adding additional counts. The final information charged eight counts: three counts of second-degree rape of a child, one count of third-degree rape of a child, one count of second-degree child molestation, one count of tampering with a witness, violation of a court order, and

---

[1] According to Green, K.L. cried and said that she "couldn't get the person in trouble." K.L. confessed "[i]t was my brother Anthony." K.L. also told Green that she did not want to get Pressley in trouble because she really loved him. K.L. recounted the discussion differently. K.L. stated that her mom began blurting out names. When Green said, "Is it Anthony," K.L. "said yeah.".

[2] Nguyen is Andrea Green's daughter, but has a different father than both Pressley and K.L.

violation of a sexual assault protection order. The sex offenses were all charged as a pattern of sexual abuse.

A jury convicted Pressley as charged and returned a special verdict finding that the sex offenses were part of an ongoing pattern of sexual abuse. Based on the jury's finding on the special interrogatory, the court sentenced Pressley to an exceptional minimum term of 326 months to life.[3]

Pressley appeals.

## DISCUSSION

Pressley appeals the court's admission of evidence, the sufficiency of evidence of an alternate means of witness tampering, whether written factual findings support the court's exceptional sentence, and two conditions of community custody.

I.     ER 404(b) Evidence

Pressley argues that testimony by his longtime friend, Emily Lothchomphou, was propensity evidence improperly admitted under ER 404(b) as evidence of motive. Over Pressley's objection, the State sought to introduce testimony from Lothchomphou as to comments Pressley made about his dying father around October 2020. These statements occurred after Pressley had been charged with raping K.L.

---

[3] The court imposed minimum terms of 280 months for each of the second-degree child rapes, 116 months for child molestation, and 60 months for third degree rape of a child to be served concurrently. The court also imposed 22 months for witness tampering, and 364 days each for the gross misdemeanor violations of the court and protection orders to be run consecutively to each other and the sex offenses.

Pressley was estranged from his father, Tony Pressley,[4] who was incarcerated for raping his own biological daughter, Shannon. When Pressley informed Lothchomphou that Tony had a brain tumor, she replied "Good." According to Lothchomphou, Pressley responded, "Why would you say that? I mean, like he is a person too." Lothchomphou told Pressley, "I believe that people who do the things that your father did do not deserve to breathe the same air as us." She testified that Pressley then said, "Why would you think someone who has that style of love, don't you think it would be hard on them for society to say you can't love people like that? . . . What if you were someone who had a love like that and society said you couldn't?"

During the initial hearing on admission of Lothchomphou's testimony about this conversation, the State informed the court it "will absolutely not be arguing that because his father did something, he did it too." Rather, the State sought admission of the evidence to show motive, intent, and state of mind. The State "view[ed] the comment with Emily as almost an admission." Pressley argued the evidence was irrelevant and propensity evidence.

> So, whether or not he chooses to defend his father or at least to just say I don't necessarily wish him to be dead is not relevant to this case. It confuses the issue.
> But the other part of it is, it is propensity evidence. It's basically saying, look, he is the type of person who would commit these kinds of crimes.

In considering whether to admit the evidence, the court noted, "[i]f he was talking specifically in relation to himself, there would be no issue. The only issue

---

[4] For clarity we refer to Tony Pressley by his first name. We intend no disrespect.

here is it's in reference to his father's behavior." Initially, the court concluded Lothchomphou's testimony was not admissible for the purposes of motive. However, the court agreed that if Pressley testified, the evidence might be admissible on rebuttal as evidence of intent.

At the State's request, later during pretrial proceedings, the court revisited the admissibility of Lothchomphou's testimony as evidence of Pressley's thinking. In response, the court noted, "But it's in relation to a statement he made in response to [sic] his father, not himself. And to me that's the distinguishing factor." The State argued that Pressley's statement was relevant to "his state of mind and his own rationalization and minimalization [sic] in this case." Pressley continued to object to the evidence as character evidence showing propensity and as highly prejudicial. The court determined the evidence was admissible to show defendant's state of mind and intent. The court offered to give a limiting instruction to the jury.

After a recess and voir dire, the court returned to Lothchomphou's testimony a third time to make a final ruling on the issue. Relying on State v. Saltarelli, 98 Wn.2d 358, 655 P.2d 697 (1982), the court admitted the evidence to show motive, but not to show intent. The court stated that Saltarelli defined motive as "[a]n inducement, or that which leads or tempts the mind to indulge a criminal act," which was exactly the basis upon which the State was attempting to admit Lothchomphou's testimony. The court then weighed the probative value of Lothchomphou's testimony against its prejudice:

> I will acknowledge and admit that there is prejudice in relation to this evidence being admitted. But clearly, here, there is a significant issue in relation to whether the act occurred or not. And based upon this case, when I am limiting it to motive only, not propensity evidence, and motive is permitted under the rule, I will find that it's not more prejudicial than probative. It is probative to the issues in this case.

Accordingly, Lothchomphou testified to the conversation. The court issued a limiting instruction immediately after the testimony and when the case was submitted to the jury:

> Certain evidence has been admitted for only a limited purpose. This evidence consists of statements made by the defendant regarding his biological father. You may consider this evidence for purposes of determining the defendant's motive. You may not consider it for any other purpose. Any discussion of this evidence during your deliberations must be consistent with this limitation.

On appeal, Pressley renews his argument that the evidence was inadmissible character and propensity evidence under ER 404(b). ER 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, this evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). In determining the admissibility of prior acts, "the court first must analyze whether the evidence is logically relevant to prove an 'essential ingredient' of the charged crime rather than simply to show the defendant had a propensity to act in a certain manner which he followed on that particular occasion." State v. Bowen, 48 Wn. App. 187, 190, 738 P.2d 316 (1987), overruled on other grounds by State v. Lough, 125 Wn.2d 847, 889 P.2d

7

487 (1995). "[T]he question to be answered in applying ER 404(b) is not whether a defendant's prior bad acts are logically relevant—they are.  Evidence that a criminal defendant is a 'criminal type' is relevant." State v. Slocum, 183 Wn. App. 438, 456, 333 P.3d 541 (2014). However, the policy for excluding such evidence, despite its probative value, is " 'the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.' " Id. (quoting Michelson v. United States, 335 U.S. 469, 476, 69 S. Ct. 213, 93 L. Ed. 168 (1948)).

We review a trial court's decision to admit or exclude evidence for abuse of discretion.  State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). A trial court abuses its discretion when a decision is manifestly unreasonable or based on untenable grounds or reasons.  Id.

Here, the testimony recounted a statement Pressley made about his dying father, acknowledging his humanity and flaws. Pressley's sympathy for his father does not make the existence of any fact pertaining to the charged crimes any more probable. But to the extent the inference that Pressley feels sorry for his father because he has the same "style of love" as his father, it could suggest Pressley has a propensity toward engaging in the sex offenses as charged. Thus, the comments about his father constitute character evidence that is generally inadmissible unless introduced for "other purposes" as set forth in ER 404(b).

The court considered and admitted the evidence under ER 404(b) to prove motive.  Motive "can demonstrate an impulse, desire, or any other moving power

which causes an individual to act." State v. Powell, 126 Wn.2d 244, 259, 893 P.2d 615 (1995).   As noted by the trial court, courts have also defined motive as " '[a]n inducement, or that which leads or tempts the mind to indulge a criminal act.' " Saltarelli, 98 Wn.2d at 365 (quoting BLACK'S LAW DICTIONARY 1164 (4th rev. ed. 1968)). Here, the trial court admitted Lothchomphou's testimony to show that Pressley was motivated to commit the sex offenses because he not only sympathized with, but also had the same "style of love" as his convicted sex offender father. In other words, the court found that the statement shows motive by inferring that his own "style of love" led Pressley to commit the charged offenses.

Even if evidence is relevant, the court must evaluate the evidence under ER 403, which requires consideration of whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  ER 403; State v. Scherf, 192 Wn.2d 350, 387, 429 P.3d 776 (2018).  The party seeking to exclude the evidence has the burden of proving unfair prejudice.  State v. Burkins, 94 Wn. App. 677, 692, 973 P.2d 15 (1999).  Evidence is unfairly prejudicial if it is likely to elicit "an emotional response rather than a rational decision."  Powell, 126 Wn.2d at 264.  Unfair prejudice is that caused by evidence of "scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  Carson v. Fine, 123 Wn.2d 206, 223, 867 P.2d 610 (1994) (internal citations omitted).  We afford trial courts broad discretion "in balancing the probative value

9

of evidence against its potential prejudicial impact." State v. Coe, 101 Wn.2d 772, 782, 684 P.2d 668 (1984).

The admitted evidence shows Pressley sympathized with his father, who had been convicted of the same type of crimes charged in this case. But to interpret the statement as evidence of Pressley's motive to engage in the charged conduct involving K.L. requires the jury to assume that Pressley was talking about himself, rather than his father, and that he was essentially admitting his own "style of love"—i.e., he had the same desire to engage in sex offenses— to Lothchomphou. While a possible inference, the statement is minimally probative of Pressley's own motive with respect to K.L. specifically. While the court issued a limiting instruction that the jury was to consider the evidence only for motive, the admission of this evidence inevitably allowed the jury to draw parallels between Pressley and his sex offender father. The limiting instruction magnified, rather than limited, the prejudice by providing a connection between otherwise tenuous evidence and Pressley's behavior.

Moreover, Lothchomphou's testimony was the first mention of Tony's incarceration for raping his daughter Shannon. Green had testified that Tony was in prison, but did not state the reason for his incarceration. The State elicited that Tony was incarcerated for raping Shannon solely in the context of Pressley's conversation with Lothchomphou. Without Lothchomphou's testimony, the jury would not have heard that Tony had been convicted of a crime similar to those

10

with which Pressley was charged.[5] Introduction of Lothchomphou's conversation with Pressley set up an unavoidable comparison for the jury: like father, like son. The statement was thinly veiled propensity evidence.  Propensity evidence is particularly prejudicial in sex offense cases. State v. Saltarelli, 98 Wn.2d at 363.

The danger of unfair prejudice substantially outweighs the minimal probative value of Pressley's statements to Lothchomphou. Therefore, the court abused its discretion by admitting the testimony.

Evidentiary error may be harmless and requires reversal only if it leads to prejudice.  State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001).  "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " Id. (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).  Improperly admitted evidence is harmless if it is of minor significance in relation to the evidence as a whole.  Neal, 144 Wn.2d at 611.

The trial lasted several days with testimony from K.L., Pressley, Green, Lothchomphou, and several police officers, among others. Several witnesses testified about the close relationship between Pressley and K.L. Green testified that Pressley occasionally showed up unexpectedly at her house in the middle of the night to spend time with K.L. Green would wake around midnight and find Pressley in K.L.'s room, sitting on her bed with her. Green began to think the amount of time Pressley and K.L. spent together "was a little out of the ordinary."

---

[5] During earlier cross-examination, Green had testified that she had been sexually assaulted by Tony, but did not mention whether that led to his being charged or convicted.

11

So Green pulled each of them aside, separately, and said "you guys are spending an awful lot of time together. It's a little strange." Both Pressley and K.L. told Green "that it was kind of all in [her] head" because she is "an introvert" and "not a very affectionate person."

Pressley's ex-girlfriend testified that K.L. would visit and spend the night at the apartment she and Pressley shared. The apartment had three bedrooms and a spare bonus room. When K.L. spent the night, she slept in Pressley's room with him, while his ex-girlfriend slept in the spare bedroom with their infant. Pressley confirmed these sleeping arrangements, testifying that at his apartment, K.L. slept with him in his bed. According to Pressley, this was because his cat had urinated on the spare bed and he could not remove the smell.

K.L. testified that Pressley initiated sexual contact and eventually started having sex with her during her visits to his apartment. She stated that they had sex several times each visit, and estimated they had intercourse fifty to sixty times between October 2018 and February 2019. K.L. said that Pressley bought her a purple "U" shaped vibrator from Amazon that they used during sex. K.L. also testified that she had taken a pregnancy test at Pressley's home and disposed of it in the bathroom trashcan.

When police conducted a search of Pressley's home, they found a used pregnancy test in the bathroom garbage. They also found a purple vibrator in a black box on an upper shelf in his closet. Pressley testified that he purchased the vibrator from Amazon for use by himself with another sex toy. He said he never discussed the vibrator with K.L., showed it to her, or told her where it was

12

located.

However, DNA analysis found two contributors of DNA on the vibrator. The DNA sample from the vibrator had "a discrete major female contributor." A visual comparison of the DNA profile from the vibrator sample showed matches at all 23 regions of the DNA profile from a sample taken from K.L. The statistical software calculated "it was 1.9 nonillion[6] times more likely that the mixture was a mixture of [K.L.] and one unknown contributor" compared to two unknown individuals. The laboratory analysis also concluded that "[a]ssuming two contributors, it is 3,000 times more likely to observe this DNA profile if it originated from Anthony Pressley and an unknown contributor rather than two unrelated individuals selected at random from the United States population."

From this testimony, the jury heard that K.L.'s DNA was mixed with Pressley's on a vibrator he admitted to owning but denied that he had ever discussed or used with K.L. Further, K.L. knew details about the vibrator including color, shape, and where Pressley purchased it. K.L. also knew that Pressley had a second sex toy, lubricant, and used Viagra. Additionally, K.L. testified that Pressley had undergone a vasectomy. He told her he would not have sex with her until he "got clipped" so she would not get pregnant. When they had sex, Pressley did not use a condom because he "got clipped." Pressley confirmed he had a vasectomy in December 2018.

Pressley's defense was general denial of the charged crimes. While both K.L. and Pressley had credibility issues related to their testimony, the very

---

[6] $10^{30}$. WEBSTER'S NEW INTERNATIONAL DICTIONARY 1549 (3rd ed. 1969).

specific, objective, and highly corroborative evidence about the vibrator bolstered K.L.'s credibility. Because of this physical evidence, the case did not rely solely on the credibility of the parties. In comparison to the physical evidence and other testimony, Lothchomphou's testimony about Pressley's statements about his father had minor significance. Given the other ample evidence supporting K.L.'s testimony that the charged crimes occurred, including physical evidence, the outcome of the trial would not, within reasonable probabilities, have been materially affected had the court excluded the inadmissible evidence. Although Lothchomphou's testimony was unfairly prejudicial, the physical evidence allows us to conclude that admission of the improper propensity evidence was harmless error.

II.    Witness Tampering Alternative Means

Pressley contends the State failed to present sufficient evidence of each alternative means of witness tampering to support a conviction. The State points to specific testimony that established the elements of witness tampering. We agree that the State offered sufficient evidence to prove both charged alternative means of witness tampering.

Criminal defendants have a right to a unanimous jury verdict. WASHINGTON CONSTITUTION art. I, sec. 21. "This right may also include the right to a unanimous jury determination as to the means by which the defendant committed the crime when the defendant is charged with (and the jury is instructed on) an alternative means crime." State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).  To evaluate whether unanimity as to means is required, courts examine whether

sufficient evidence exists to support each of the alternative means submitted to the jury. State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231, 235 (1994). When sufficient evidence supports each of the alternative means of committing the crime, express jury unanimity as to which means is not required. Owens, 180 Wn.2d at 95. Insufficient evidence on any one means necessitates a particularized expression of jury unanimity, or the conviction is invalid. Id.

Witness tampering is an alternative means crime. State v. Lucas-Vicente, 22 Wn. App. 2d 212, 220, 510 P.3d 1006 (2022). Under RCW 9A.72.120(1), a person is guilty of witness tampering if they induce a witness in an official proceeding to:

> (a) Testify falsely or, without right or privilege to do so, to withhold any testimony; or
> (b) Absent himself or herself from such proceedings; or
> (c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation or the abuse or neglect of a minor child to the agency.

Here, the State charged Pressley under RCW 9A.72.120(1)(a) and (b). The court instructed the jury on those two alternative means of committing witness tampering, but did not issue a unanimity instruction on means. Pressley acknowledges that the State presented evidence to support conviction under RCW 9A.72.120(1)(a), but argues the State failed to provide sufficient evidence to establish that he induced K.L. to absent herself from any official proceeding as required for conviction under RCW 9A.72.120(b).

"Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, it allows any rational trier of fact to find all

15

of the elements of the crime charged beyond a reasonable doubt." State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences therefrom. Id. Review for sufficiency of the evidence is highly deferential to the jury's decision, and we do not consider issues of credibility, persuasiveness, and conflicting testimony. State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

During trial, a detective on the case testified that K.L. told her Pressley made statements about her testifying:

> She had said that he would say things to her such as, you know, don't show up for court, if you tell the family -- or if you say you are lying, the family will only be mad at you for a little bit, and you won't get in trouble because you are a minor.

This testimony supports both charged means of committing witness tampering.[7] Of particular import is the detective's statement that Pressley told K.L., "don't show up for court." Pressley did not object to this testimony.[8] Viewing this testimony in the light most favorable to the State, the evidence demonstrates that Pressley induced K.L. to absent herself from the proceedings in violation of RCW 9A.72.120(1)(b). The State presented sufficient evidence of both charged means of witness tampering.

---

[7] In addition, as Pressley concedes, K.L.'s testimony that Pressley told her, "I could just like say it was all a lie," was sufficient to establish the first means.

[8] The State also points to testimony from Shelby Nguyen, who recounted K.L.'s statement that Pressley asked her not to testify or to drop the charges. Pressley objected on hearsay grounds. The court sustained the objection but did not strike the testimony from the record. Because the detective's testimony was admitted without objection and provides the same evidence, we need not consider Nguyen's statement.

III.     Exceptional Sentence

Pressley argues the trial court failed to enter written findings of fact and conclusions of law to support an exceptional sentence. The State argues the trial court's completion of the checkbox portion of the judgment and sentence amounts to written findings of fact and conclusions of law.  We disagree.

The Sentencing Reform Act (SRA) allows a trial court to deviate from a standard range sentence if "there are substantial and compelling reasons." RCW 9.94A.535.  When imposing an exceptional sentence, the trial court "shall set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535. "[T]he SRA's written findings provision requires exactly that—written findings." State v. Friedlund, 182 Wn.2d 388, 394, 341 P.3d 280 (2015). The only permissible finding of fact is to confirm that the jury has found an aggravating fact proven beyond a reasonable doubt. State v. Sage, 1 Wn. App. 2d 685, 709, 407 P.3d 359 (2017). The court must then make the legal determination as to whether those aggravating factors are substantial and compelling reasons to impose an exceptional sentence. Id.

Here, the trial court referenced the aggravating factor by completing a section of the judgment and sentence form as follows:

> Aggravating factors were [ ] stipulated by the defendant, [ ] found by the court after the defendant waived jury trial, [X] found by jury by special interrogatory. [ ] Findings of fact and conclusions of law are attached in Appendix 2.4. [ ] The jury's interrogatory is attached. The prosecuting attorney [X] did [ ] did not recommend a similar sentence.
>
> EXCEPTIONAL MINIMUM TERM [For Maximum and Minimum Term Sentence]. Substantial and compelling reasons exist which

> justify an exceptional minimum term above the standard range. This will be accomplished by the below consecutive sentence within the standard range: Count(s) 5, 7, and 8 will run consecutively to each other and consecutively to Counts 1, 2, and 3. Counts 1, 2, 3, 4, and 6 will run concurrently to each other. RCW 9.94A.507(3); 9.94A.535. Findings of fact and conclusions of law are attached in Appendix 2.4. The prosecuting attorney [X] did [ ] did not recommend a similar sentence.

This section of the form states in pre-printed text that "[f]indings of fact and conclusions of law are attached" in an appendix. However, no such appendix appears in the record. In a subsequent section of the form detailing the terms of confinement, the court noted consecutive sentences and wrote by hand "based on jury finding of aggravating circumstances and 'free crimes' rule." Nowhere in the judgment and sentence does the court provide the specifics of the aggravating factor, the jury verdict, or any findings of fact and conclusions of law to support application of the free crimes rule.

The trial court did not provide the requisite written findings of fact confirming the jury's special verdict on the aggravating factor and the legal conclusion that the aggravating factor provided substantial and compelling grounds for the exceptional sentence. Because the court's failure to comply with RCW 9.94A.535 was error, we remand for entry of the appropriate findings of fact and conclusions of law.[9]

---

[9] When a court fails to enter findings of fact and conclusions of law supporting an exceptional sentence, the remedy is to remand for entry of those findings and conclusions. In re Pers. Restraint of Breedlove, 138 Wn.2d 298, 311, 979 P.2d 417 (1999).

IV.     Community Custody Conditions

Pressley challenges two conditions of community custody, condition 17, prohibiting him from dating women or forming relationships with families who have minor children, and condition 21, prohibiting him from internet access without permission. Appellate courts review community custody conditions for abuse of discretion and will reverse a manifestly unreasonable condition. State v. Irwin, 191 Wn. App. 644, 652, 364 P.3d 830 (2015). A trial court abuses its discretion if it imposes an unconstitutional community custody condition. State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). Conditions that interfere with fundamental constitutional rights must be sensitively imposed and reasonably necessary to accomplish essential state needs and public order. State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). We review constitutional questions de novo. Wallmuller, 194 Wn.2d at 238. We do not presume that a community custody condition is constitutional. Irwin, 191 Wn. App. at 652.

A.     Relationships with Families with Minor Children

Community custody condition 17 establishes a crime-related prohibition: "Do not date women nor form relationships with families who have minor children, as directed by the supervising Community Corrections Officer." In

keeping with several prior cases, we conclude this condition is unconstitutionally vague.[10]

A community custody condition is unconstitutionally vague if "(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement." State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). When considering the meaning of a community custody condition, "the terms are not considered in a 'vacuum,' rather, they are considered in the context in which they are used." State v. Bahl, 164 Wn.2d 739, 754, 193 P.3d 678 (2008). "If persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of disagreement, the [law] is sufficiently definite." City of Spokane v. Douglass, 115 Wn.2d 171, 179, 795 P.2d 693 (1990), quoted in Nguyen, 191 Wn.2d 671, 679, 425 P.3d 847 (2018).  A community custody condition is not unconstitutionally vague merely because a person cannot predict with complete certainty the point at which the actions would be classified as prohibited.  Nguyen, 191 Wn.2d at 679.

---

[10] In unpublished decisions, this court has previously determined that the same community custody conditions prohibiting "relationships with families with minor children" were unconstitutionally vague. See State v. Mansour, 14 Wn. App. 2d 323, 334, 470 P.3d 543 (2020), review denied, 196 Wn.2d 1040, 479 P.3d 708 (2021) (published in part on other issues); State v. Zavala, No. 80817-6, slip op. at 10 (Wash. Ct. App. April 26, 2021) (unpublished); In re Personal Restraint of Fagin, No. 80545-2, slip op. at 7 (Wash. Ct. App. November 1, 2021) (unpublished); State v. Robinett, No. 50653-0, slip op. at 7-9 (Wash. Ct. App. Jan. 15, 2019) (unpublished). Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions."  GR 14.1(c).  "However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate."  GR 14.1(a).

In Nguyen, the Washington Supreme Court considered whether the term "dating relationship" was unconstitutionally vague in a community custody condition. 191 Wn.2d at 682-83. The Court noted, "[a] 'relationship' is defined as "a state of affairs existing between those having relations.' " Id. at 682 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1916 (2002)). Using this definition with the objective modifier "dating," a person of ordinary intelligence could distinguish a "dating relationship" from other types of relationships. Nguyen, 191 Wn.2d at 682.

Unlike the condition in Nguyen, Pressley's community custody condition has a general prohibition on relationships with families with minor children. The broad definition could apply to any reoccurring interaction with a family. Without a modifier or qualifier for the type of relationship with a family, the condition does not provide sufficiently ascertainable standards such that Pressley could understand the prohibited conduct and is protected from arbitrary enforcement. As a result, the condition prohibiting relationships with families with minor children is unconstitutionally vague and we remand to the trial court to strike the condition.

### B. Internet Usage

Condition 21 broadly prohibits Pressley from accessing the internet without permission:

> Do not access the Internet on any computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches) in any location, unless such access is approved in

advance by the supervising Community Corrections Officer and
your treatment provider.

The State acknowledges that the record contains no analysis of the crime-related nature of the prohibition and requires remand.

A sentencing court has the discretion to impose a crime-related prohibition as a condition of community custody. RCW 9.94A.703(3)(f). A crime-related prohibition "means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). A "reasonable relationship" must exist between the crime of conviction and the community custody condition. Nguyen, 191 Wn.2d at 684. The prohibited conduct need not be identical, but there must be some basis for the connection to the crime of conviction. Id.

Here, the trial court did not consider whether a reasonable relationship existed between internet usage and the circumstances of Pressley's crime. Therefore, we accept the State's concession and remand to the trial court to strike the condition.

CONCLUSION

We affirm Pressley's convictions but remand for entry of written findings of fact and conclusions of law regarding the exceptional sentence, and to strike community custody conditions 17 and 21.

_Cheng, J._

WE CONCUR: